1  Yana G. Henriks (SBN 250638)
   Email: yhenriks@aol.com
2  McMURRAY HENRIKS LLP
   5670 Wilshire Boulevard, Suite 1450
3  Los Angeles, CA 90036
   Telephone: (323) 931-6200 Facsimile: (323) 931-9521
4
5  Victor K. Sapphire (SBN 218634)
   Email: vic.sapphire@novakdruce.com
6  NOVAK DRUCE CONNOLLY BOVE + QUIGG LLP
   333 South Grand Avenue, Suite 2300
7  Los Angeles, CA 90071
   Telephone: (213) 787-2500 Facsimile: (213) 687-0498
8
   Attorneys for Defendants
9  RANDY H. McMURRAY, P.C. and
   RANDY H. McMURRAY
10

11            UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13  THE COCHRAN FIRM, P.C.,              Case No. CV12-05868-SJO (MRWx)

14            Plaintiff,                 Hon. S. James Otero

15        v.                            **AMENDED COUNTERCLAIMS OF
                                        DEFENDANTS AND
16  THE COCHRAN FIRM LOS                COUNTERCLAIMANTS RANDY H.
    ANGELES, LLP; ET AL.,               McMURRAY, P.C. AND RANDY H.
17                                      McMURRAY**
            Defendants.
                                        **1. RICO COUNT ONE
18  RANDY H. McMURRAY, P.C.; and        2. FRAUD
    RANDY H. McMURRAY,                  3. TORTIOUS INTERFERENCE
19                                      WITH PROSPECTIVE BUSINESS
                                        ADVANTAGE
20            Counterclaimants,         4. LANHAM ACT 15 U.S.C. §§ 1051
                                        5. LANHAM ACT 15 U.S.C. §§ 1125(a)
21        v.                            6. RIGHT OF PUBLICITY, CAL CIV
                                        CODE § 3344
22  THE COCHRAN FIRM, P.C.; THE         7. UNFAIR COMPETITION CAL B&P
    COCHRAN FIRM – COCHRAN,             CODE §17200
23  CHERRY, GIVENS, SMITH &             8. AVOIDANCE OF FRAUDULENT
    SISTRUNK, P.C.; DUNN LAW,           TRANSFER § 3439
24  APC; BRIAN T. DUNN; SAMUEL          9. CONVERSION
    A. CHERRY; J. KEITH GIVENS;         10. BREACH OF FIDUCIARY DUTY**
25  JOSEPH BARRETT; BARVIE
    KOPLOW; and DOES 1-10,              **JURY TRIAL DEMANDED**
26  inclusive

27            Counterdefendants.

28

   _____
   AMENDED COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS RANDY H. McMURRAY,
   P.C. AND RANDY H. McMURRAY

1  Counterclaimants Randy H. McMurray and Randy H. McMurray P.C.

2  (collectively, "McMurray"), on personal knowledge as to their acts and on information

3  and belief as to all others, allege as follows:

4  ## NATURE OF THE ACTION

5  1.  This lawsuit concerns how the Plaintiff, an ostensibly national law firm

6  based in Alabama, misappropriated the name "The Cochran Firm" for its exclusive use

7  in violation of law and professional standards and acted in concert with the other

8  counterdefendants in an unlawful scheme to defraud attorneys and clients alike.  Using

9  the "The Cochran Firm" trademark, the Counterdefendants, including McMurray's two

10  partners in The Cochran Firm Los Angeles general partnership ("TCFLA-GP"),

11  improperly ousted McMurray from the firm in which he was the majority shareholder

12  and managing partner.  Not content to stop there, Counterdefendants misappropriated

13  and continue to misuse McMurray's identity for the purpose of their self-enrichment

14  by using his accomplishments to enhance and promote their firm, and by defrauding

15  the IRS, state tax authorities, and other creditors of the firm.  Accordingly, McMurray

16  alleges counterclaims for RICO, violation of the Lanham Act, cancellation of

17  trademark registration, fraud, and other state law claims.

18  ## THE PARTIES

19  2.  Counterclaimant Randy H. McMurray ("RHM") is an individual residing

20  and practicing as a licensed attorney in Los Angeles, California.

21  3.  Counterclaimant Randy H. McMurray, P.C. ("RHMPC") is a California

22  professional corporation.  RHM is the sole shareholder of RHMPC. RHMPC is one of

23  the corporate partners of TCFLA-GP, a California general partnership formed in 2007

24  in Los Angeles, California.  TCFLA-GP has done business as "The Cochran Firm Los

25  Angeles" or "The Cochran Firm – Los Angeles" since its formation. TCFLA-GP has

26  three corporate shareholders and partners:  RHMPC, Brian T. Dunn, P.C., and The

27  Barrett Law Firm, P.C. since 2010.

28

AMENDED COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS RANDY H. MCMURRAY, P.C.
AND RANDY H. MCMURRAY

4.     The Cochran Firm, P.C. ("Plaintiff") is the named Plaintiff in this action. Although the Second Amended Complaint asserts that Plaintiff is "an Alabama corporation having its principal place of business at 163 W. Main Street, Dothan, Alabama 36301," no Alabama business entity is registered under that name.  On information and belief, Plaintiff does not exist.

5.     Counterdefendant The Cochran Firm – Cochran, Cherry, Givens, Smith & Sistrunk, P.C. ("TCF-CCGSS") is an Alabama domestic professional corporation. According to Alabama state records, the legal name of TCF-CCGSS was "Cochran, Cherry, Givens & Smith, P.C." from its incorporation, "The Cochran Firm – Cochran, Cherry, Givens & Smith, P.C." from 2004, and its current name since 2010.

6.     Attached hereto as Exhibit A is a true and correct copy of a reservation for the name "The Cochran Firm, P.C." filed on March 12, 2013 with the Alabama Secretary of State by counterdefendant Keith Givens.  Exhibit A confirms that, as of that date, Plaintiff did not exist.  As of today, an entity bearing the name "The Cochran Firm, P.C." still has not been incorporated in Alabama.

7.     Counterdefendant Samuel A. Cherry ("Cherry") is an individual residing and practicing as a licensed attorney in the State of Alabama.

8.     Counterdefendant J. Keith Givens ("Givens") is an individual residing and practicing as a licensed attorney in the State of Alabama.

9.     Cherry and Givens are founding incorporators, shareholders, and senior officers of TCF-CCGSS.

10.   Counterdefendant Dunn Law, APC purports to be a California professional corporation formed on February 9, 2012 in Los Angeles County, California. Dunn Law, APC purports to do have been conducting business under the fictitious name The Cochran Firm California since February 16, 2012.

11.   Counterdefendant Brian T. Dunn ("Dunn") is an individual residing and practicing as a licensed attorney in Los Angeles County, California. Dunn is the sole shareholder of both Dunn Law, APC and Brian T. Dunn, P.C.

12.   Counterdefendant Joseph Barrett ("Barrett") is an individual residing and practicing as a licensed attorney in Los Angeles County, California.  Barrett is the sole shareholder of The Barrett Law Firm, P.C.

13.   Counterdefendant Barvie Koplow ("Koplow") is an individual residing in Los Angeles County, California. From 2007 to 2012, Koplow was the office administrator of TCFLA-GP and held herself out as the chief financial officer and chief operations officer of TCFLA-GP. Koplow is also currently employed by Dunn at the direction of Cherry to aid the operation of The Cochran Firm.

## **NON PARTY PARTICIPANTS**

14.   Bonnie Niver ("Niver") is the operations manager of several shell companies largely owned by Cherry and Givens.  Niver purports to be the "national operations" manager of Plaintiff.

15.   James Oates ("Oates") is the owner and operator of Data Sys. Inc, a California entity.  Oates was the IT vendor for TCFLA-GP and currently works for and acts as an agent of Cherry, Givens, their shell companies, Dunn, and Barrett.

16.   Alla Ratynets ("Ratynets") is a CPA and the owner of Eichenbaum, Comer & Ratynets, AAC.  Ratynets was McMurray's CPA and handled McMurray's personal and corporate tax returns and TCFLA-GP's tax returns. Ratynets worked closely with, and under the direction of Koplow.

17.   McMurray is currently ignorant of the true names and capacities of the counterdefendants sued herein as DOES 1-10, inclusive, and therefore sues those counterdefendants by such fictitious names.  McMurray will amend these Counterclaims to allege said counterdefendants' true names and capacities when same are ascertained. McMurray is informed and believes, and thereon alleges, that each of said fictitiously named counterdefendants is, in some legally actionable manner, responsible for the unlawful acts and/or omissions herein alleged and that McMurray's injuries and damages as herein alleged were proximately caused by said unlawful acts and/or omissions on the part of said fictitious counterdefendants. McMurray hereby

incorporates herein by reference each and all of the charging allegations set forth herein below and hereby make those allegations against each and all of said fictitious counterdefendants.

18.  On information and belief, TCF-CCGSS, Cherry, Givens, Dunn Law, APC, Dunn, Barrett, Koplow, DOES 1-10, and each of them, conduct business and conduct or conspire with other counterdefendants to conduct the affairs of one or more association-in-fact or RICO enterprises or aid and abet in the operation of one or more RICO enterprises that has contacts with and/or causes injury in the state of California and in this judicial district.

## JURISDICTION AND VENUE

19.  This action arises under the Racketeering Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.,* and under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*  This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, 18 U.S.C. §§ 1964(c) and (d), 15 U.S.C. § 1221 and 28 U.S.C. § 1338(a) and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

20.  This Court has general and/or specific personal jurisdiction over all counterdefendants with respect to the conduct alleged in these Counterclaims. Counterdefendants have their principal place of business or residence inside this judicial district, engaged in conduct as described herein in this judicial district, received license fees and other income generated in this judicial district that is the subject of this litigation, and/or caused injury to McMurray in this judicial district and a substantial part of the events, omissions, and injuries giving rise to these Counterclaims against counterdefendants occurred in this judicial district.

21.  Venue is proper in the U.S. District Court for the Central District of California under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391 because counterdefendants reside or transact business and/or conduct the affairs of one or more RICO enterprises, and/or aid and abet in unlawful schemes in this judicial district, and/or cause injury in

1   this judicial district.  A substantial part of the conduct, events, and/or injuries giving

2   rise to these Counterclaims occurred in this judicial district.

3   **RELEVANT TIME PERIOD**

4        22.  Counterdefendants' racketeering conduct began in or about April 2003 and

5   continues to date.

6   **GENERAL ALLEGATIONS**

7   **A.**    **COUNTER DEFENDANTS' OVERALL SCHEME**

8        23.  On or about March 15, 1999, prominent attorney Johnnie L. Cochran, Jr.

9   ("Cochran") entered into partnership with Cherry, Givens, and Jock Smith for the

10   purpose of expanding his firm.  These parties entered into a partnership agreement and

11   formed Cochran, Cherry, Givens & Smith, a California Limited Liability Partnership

12   ("CCG&S LLP").

13        24.  In or about June 1999, Givens, on behalf of CCG&S LLP, invited

14   McMurray to be co-managing partner with Cochran of the Los Angeles office of

15   CCG&S LLP  located at 4929 Wilshire Boulevard, Suite 1010, Los Angeles, California

16   90010.  Givens promised McMurray – who at the time was a very successful attorney

17   on a partnership track with the firm now known as Robins, Kaplan, Miller & Ciresi

18   L.L.P. – all legal rights as a partner of CCG&S LLP.  The invitation was made via

19   telephone calls and in written correspondence.  McMurray then met with Cochran in

20   Los Angeles and with Cherry, Givens, and Jock Smith in Alabama in or about June

21   1999 to discuss this offer, at which time each represented to McMurray that he would

22   become a partner of CCG&S LLP with all legal rights as a partner.

23        25.  McMurray relied on the foregoing representations and accepted CCG&S

24   LLP's offer. Beginning in or about June 1999, CCG&S LLP began to represent to the

25   public, through its website and printed marketing materials, that McMurray was a

26   managing partner of the Los Angeles office of "The Cochran Firm,"  CCG&S LLP

27   used to promote its services to public.

28

26.   In or about 2000, Cochran made numerous written promises to McMurray assuring McMurray that McMurray was the "main man" in the Los Angeles office and that he would have all the rights of a partner under the 1999 partnership agreement of CCG&S LLP.

27.   From 1999 to 2003, as a partner at CCG&S LLP's Los Angeles office, McMurray worked hard and invested time, money, and his reputation into building the office's business. McMurray's efforts significantly increased the office's revenue.  In 2003, after four years as an under-acknowledged partner, McMurray requested that his partnership status be documented.

28.   On or about April 21, 2003, McMurray received a letter via mail signed by Givens, Cherry, and Cochran, among others.  The letter stated that it was memorializing McMurray's "elevation in the firm to the status of a named partner of The Cochran Firm's Los Angeles office" because of his contribution to the success of the firm for past four years and noted that "[o]ur firm has grown and prospered in no small part due to your efforts."  A true and correct copy of the letter is attached hereto as Exhibit B.

29.   Notwithstanding the above letter, on or about September 30, 2004, without McMurray's knowledge, Givens mailed an LLP Certificate of Registration to the State Bar of California via mail that declared, under penalty of perjury, that McMurray was a "Non Partner" attorney at CCG&S LLP.  Givens knew that McMurray's status as partner was unchanged, the partnership was not dissolved and McMurray had not been expelled.  The statement, made under penalty of perjury was false and was communicated via US mail.

30.   Plaintiff alleges in Paragraphs 13 and 14 of the Second Amended Complaint that, as of August 2004, Cochran, Cherry, Givens, and Jock Smith were the members and partners of both TCF-CCGSS (then known as "The Cochran Firm – Cochran, Cherry, Givens & Smith, P.C.") and CCG&S LLP and that all members and partners of these entities acknowledged that all references to The Cochran Firm would

include both TCF-CCGSS and CCG&S LLP.  Accordingly, all references herein to

TCF-CCGSS from August 2004 through and including February 2007 include, without

limitation, references to CCG&S LLP.

31.   On and after March 8, 2005, Cherry and Givens deliberately failed to
disclose to McMurray that the trademark "THE COCHRAN FIRM" had been
registered, U.S. Registration No. 2930153 granted March 8, 2005 (the "'153 Reg."),
even though both Cherry and Givens were partners with, and owed fiduciary duties to,
McMurray.

32.   McMurray, not suspecting any fraud, continued to work hard on behalf of
the Los Angeles office and worked closely with Cochran until Cochran's death in
March 2005.

33.   In or about December 2006, via both mail and email, Cherry and Givens,
acting on behalf of TCF-CCGSS, informed McMurray that they wanted to transfer
ownership of the Los Angeles office because the overhead expenses of the office were
high, the office was in debt, and a lawsuit by a former co-managing partner was
pending.  Cherry, on behalf of TCF-CCGSS, also informed McMurray in telephone
conversations and via email in or about December 2006 that if McMurray would agree
to assume the office's debts, including liability for the pending lawsuit, and take
responsibility for financing the office's operations, TCF-CCGSS would transfer full
ownership of the Los Angeles office as a separate entity to McMurray.  Throughout
these communications, including the February 2007 transfer of ownership of the Los
Angeles office, despite their duty to do so, Cherry and Givens deliberately failed to
inform McMurray of, and McMurray remained unaware of, the purported registration
of "THE COCHRAN FIRM" mark or their claims of exclusive right to control it,
which they knew would be material to McMurray's decision.

34.   McMurray accepted the offer, and in reliance thereon assumed the debts of
the Los Angeles office, covered its payroll obligations and obtained a business loan to
finance its continued operation.

35.   On or about February 1, 2007, McMurray formed TCFLA-GP with Dunn, which had its place of business at 4929 Wilshire Boulevard, Suite 1010, Los Angeles, California 90010. At the insistence of Cherry and Givens, McMurray obtained a business loan for $900,000 from Bank of America and personally guaranteed and secured the loan with his own property to finance TCFLA-GP's operations. McMurray also made over $200,000.00 in initial capital contributions. McMurray took a 66.66% interest and Dunn a 33.34% interest in TCFLA-GP through their respective professional corporations, RHMPC and Brian T. Dunn, P.C.  A copy of the 2007 general partnership agreement for TCFLA-GP (the "2007 Agreement") is attached hereto as Exhibit C.  The 2007 Agreement specifically states that each partner has an independent right to use the "Cochran" name. The 2007 Agreement was approved by Cherry and Givens on behalf of TCF-CCGSS via telephone and email on or about February 1, 2007.  Among other things, Cherry and Givens consented to the use of the name "The Cochran Firm Los Angeles" by TCFLA-GP.

36.   Sometime after the formation of TCFLA-GP, CCG&S LLP ceased to exist. McMurray had formed TCFLA-GP, another entity, and Cochran, the only other partner of CCG&S LLP licensed in California, had passed away in 2005.  After the formation of TCFLA-GP, Cherry, Givens, and the other partners or members of CCG&S LLP continued to operate under different entities, including TCF-CCGSS.

37.   On information and belief, following Cochran's death a settlement was reached by which, on or about September 21, 2007, according to the abstract of title in the '153 Reg. and Plaintiff's averments in its pleadings and moving papers to date, Cochran's estate assigned its purported rights in "THE COCHRAN FIRM" mark to "The Cochran Firm, P.C.," a purported Alabama professional corporation.  As alleged above, no such entity has ever existed.

38.   In 2007, 2008, and 2009, McMurray continued to work hard to help TCFLA-GP grow and prosper.  McMurray made additional capital contributions and loans to TCFLA-GP.  In addition, because of Dunn's poor credit, McMurray

personally guaranteed credit cards for use by TCFLA-GP.  McMurray hired Koplow as TCFLA-GP's office administrator.  McMurray entrusted to Koplow the task of preparing TCFLA-GP's tax returns along with her friend, Ratynet. However, unbeknownst to McMurray, as later learned from a forensic accountant's report commissioned by the Receiver in the co-pending state lawsuit, back in 2008, 2009, and 2010 Koplow had recorded bogus loans to McMurray in the partnership's tax returns in order to disguise funds fraudulently transferred to Cherry, Givens, and Dunn for which she had not issued 1099s and K-1s.

39.   From the transfer of ownership of the Los Angeles office forward, TCF-CCGSS had no role in the operation of TCFLA-GP, except that TCF-CCGSS was allowed to monitor the status of TCFLA-GP's settled cases. Every month, TCFLA-GP would remit payments to TCF-CCGSS, based on a percentage of recovery on settled cases, in reliance on TCF-CCGSS's representations by Cherry that those payments would be forwarded to Cochran's estate. Those payments were classified as referral fees on TCFLA-GP's tax returns.

**B.     PHANTOM NATIONWIDE LAW FIRM**

40.   After Cochran's death in 2005, Cherry, Givens, and TCF-CCGSS came together, devised, and implemented an organized scheme to exploit Cochran's name and reputation.  The scheme was to maximize profits and avoid the expense of maintaining local offices and potential liability. Instead of operating as one firm or a true partnership between offices, Cherry, Givens, and TCF-CCGSS designed a model where they assumed no liability or responsibility for local offices and merely collected fees for use by independent local law firms of the "The Cochran Firm" name and mark.

41.   This nationwide phantom law firm, known as "The Cochran Firm," generates its income mainly from the following activities: (1) licensing "The Cochran Firm" name to independent local law firms representing themselves as "branch offices" without operating as one firm or being part of a partnership with any other local offices; (2) collecting a percentage from the fees and awards of clients drawn to these

"branch offices" by the prospect of the security, quality, and prestige of representation by a national firm presumably established by Cochran; (3) avoiding the operating expenses, financial record-keeping duties, and oversight responsibilities of a national law firm; and (4) avoiding professional liability to clients for the malpractice of attorneys at any of its "branch offices" by taking advantage of the phantom nature of the "The Cochran Firm" Enterprise.

42.   "The Cochran Firm" Enterprise advertises to and communicates with legal services consumers in several states by means of a website owned by TCF-CCGSS, located at the following URL:  http://www.cochranfirm.com. As recently as March, 2013, the website represented the following to members of the public who viewed the website:

> Founded over 40 years ago by famed attorney, Johnnie L. Cochran, Jr., The Cochran Firm, as it is known today, has established itself as one of the premier plaintiff's litigation and criminal defense law firms in United States. With offices located across the United States, The Cochran Firm has brought together into one firm a diverse group of some of the most highly-experienced and respected men and women dedicated to bringing quality representation for injured people, their families and the ordinary citizen.

43.   The website lists branch offices in Alabama, California, the District of Columbia, Florida, Georgia, Illinois, Louisiana, Michigan, Minnesota, Nevada, New York, Ohio, Pennsylvania, Tennessee, Texas, and Wisconsin.

44.   Notwithstanding its advertising of "The Cochran Firm" as "one firm," TCF-CCGSS  has no relationship with these purported "branch offices" or "local offices" other than nakedly licensing the name "Cochran" to these offices.  On information and belief, none of these offices are in partnership with TCF-CCGSS, and TCF-CCGSS: (i) does not provide these offices with any funding or administrative support of any

1  kind;(ii) shares no losses, liabilities or common accounting with these offices; and

2  (iii) shares no professional liability insurance to insure any of these offices.

3       45.   Although TCF-CCGSS, Cherry, and Givens hold "The Cochran Firm" out

4  to the public as one firm, when TCF-CCGSS is sued, it denies the existence of "The

5  Cochran Firm" and denies being in partnership with the purported local offices.  For

6  example, in 2008, in *Hattie Neal and Mary Neal v. Cochran Cherry Givens & Smith,*

7  *P.C. and The Cochran Firm Memphis*, Case No. 1:07–cv-1935-TCB in United States

8  District Court for the Northern District of Georgia, TCF-CCGSS denied the existence

9  of The Cochran Firm in responses to interrogatories. Similarly,  in 2012, in *Jacqueline*

10  *Williams and Renna Fisher v. The Cochran Firm and The Cochran Firm Birmingham,*

11  Case No. 3:11-cv-00703, TCF-CCGSS moved to dismiss the complaint, claiming that

12  neither The Cochran Firm nor The Cochran Firm Birmingham is a legal entity.

13       46.   The "Cochran Firm" Enterprise is directed, operated and managed by

14  Cherry and Givens. TCF-CCGSS serves to hold the revenue and property generated by

15  the Enterprise.

16  **C.       CONSPIRACY TO TAKE OVER THE COCHRAN FIRM LOS**

17  **         ANGELES**

18       47.   In 2009 and 2010, McMurray began to investigate and question the nature

19  and legality of "The Cochran Firm" Enterprise.  Specifically, McMurray rejected the

20  proposal by Cherry, Givens, and/or TCF-CCGSS by which TCFLA-GP would pay 15

21  percent of its gross revenue from all cases to TCF-CCGSS without disclosing this

22  agreement to its clients and obtaining its clients' consent. This proposal violated Rule

23  2-200 of the California Rules of Professional Conduct prohibiting fee splitting.

24       48.   By 2009, Cherry and Niver (acting as the agent for Cherry, Givens, and

25  TCF-CCGSS) had already secretly recruited Koplow to act as their agent and provide

26  them with confidential information about McMurray and the business affairs of

27  TCFLA-GP.

28

49. In or about mid 2010,  Koplow surreptitiously transmitted to Cherry via email a confidential memorandum prepared by McMurray's spouse, who is an attorney, discussing various ethical implications involving an agreement with TCF-CCGSS.  Attached to the memorandum was ABA Formal Opinion 94-388, stating: "*If a law firm licenses its name to other firms, all firms licensed must operate as a single firm*." Koplow also informed Cherry that McMurray's spouse was reviewing the proposed agreements of TCF-CCGSS and had retained an ethics expert to guide McMurray's decision-making.

50. In or about the end of 2010, McMurray's spouse discovered discrepancies in the tax returns of RHMPC and TCFLA-GP and asked Koplow about these returns. Koplow immediately informed Cherry and Niver via email that McMurray's spouse was trying to find out why no K-1 or 1099 forms had been issued to TCF-CCGSS, and why certain fees paid to TCF-CCGSS had been classified as "referral fees," and that she posed "a great danger" to their operation.

51. Thereafter, on or about December 2010, Cherry informed McMurray during a telephone conversation that he had learned McMurray's spouse was trying to "submarine" their operation. Cherry demanded that McMurray keep her out of the negotiations between TCFLA-GP and TCF-CCGSS and McMurray's business affairs with TCF-CCGSS.

52. In early 2011, Cherry instructed Koplow to use the ruse of "human resources issues" to limit the access of McMurray's wife to the offices of TCFLA-GP. In response, Koplow started a campaign of recruiting employees to bring complaints about McMurray's spouse, who was never an employee of TCFLA-GP, in order to eliminate her access to the firm's office and business affairs.

53. Despite Koplow's efforts, McMurray remained unwilling to enter into any agreement with TCF-CCGSS unless there was a bona fide partnership agreement in compliance with the Rules of Professional Conduct.

54.   In or about mid-2011, in order to deceitfully appropriate McMurray's funds, Koplow, in conspiracy with and acting as the agent of Dunn, Cherry, Givens, and TCF-CCGSS, falsely represented to McMurray via email that TCFLA-GP could not make payroll and urgently needed $115,000. In fact, Koplow knew that TCFLA-GP had at least $85,000 in funds in various accounts and made these false representations to induce McMurray to loan additional funds to TCFLA-GP.  At the time Koplow made this request, Cherry, Givens, TCF-CCGSS, Dunn and Barrett had already developed plans to remove McMurray from control of TCFLA-GP.  Koplow knew from her communications with Cherry that counterdefendants intended to remove McMurray as managing partner and that McMurray thus would not be able to recover his funds.

55.   In reliance on Koplow's misrepresentations, and reasonably believing that the employees of TCFLA-GP were at risk of not being paid, McMurray withdrew $115,000 from his retirement plan to loan these funds to TCFLA-GP, thereby incurring taxes and penalties.

**D.      FRAUDULENT "RE-ESTABLISHMENT" OF TCFLA**

56.   On or about January 22, 2012, Dunn traveled to meet with Cherry and Givens at the Ritz Carlton Hotel in South Palm Beach, Florida. The purpose of the meeting was to discuss plans to oust McMurray from control of TCFLA-GP, take over its operations, and siphon its assets into a separate entity that Dunn would create and run as the "re-established" Los Angeles office of TCF-CCGSS. Dunn paid his trip expenses with two credit cards that McMurray had provided for Dunn to use only for ordinary business expenses of TCFLA-GP.  The following week, McMurray questioned Koplow about charges on the statements for these credit cards that originated in Florida.  At the behest of Dunn, Cherry, and/or Givens, Koplow lied to McMurray and told him that Dunn had attended a business meeting in Florida on behalf of TCFLA-GP.  Dunn has continued to use these credit cards to make charges outside the scope of their authorized use and has refused to pay for those charges.

1   Dunn continued using credits cards secured by McMurray for the purpose of funding

2   contingency cases he knew would be transferred to another entity. Dunn knew that the

3   charges would not be paid and McMurray would thus be personally liable for debts

4   now totaling more than $40,000.

5        57.   On or about February 9, 2012, without McMurray's knowledge and at the

6   behest of Cherry, Givens, and TCF-CCGSS, Dunn incorporated a new professional

7   corporation, counterdefendant Dunn Law, APC.  Dunn obtained EIN No. 454525275

8   from the Internal Revenue Service ("IRS") for Dunn Law, APC.

9        58.   On or about February 9, 2012, without McMurray's knowledge and at the

10  behest of Cherry, Givens, and TCF-CCGSS, Dunn established a new payroll bank

11  account for use by Dunn Law, APC under the name "The Cochran Firm Los Angeles"

12  and associated his new EIN number with that account.  Dunn contacted the IRS and the

13  California Employment Development Department ("EDD") to report the new bank

14  account and provided both the IRS and the EDD with McMurray's name as the

15  reporting party and the responsible party for the payroll account.  Dunn intended to

16  induce the IRS and the EDD to look to McMurray, as managing partner of TCFLA-

17  GP, the actual "The Cochran Firm Los Angeles," to satisfy the payroll tax withholding

18  liabilities that Dunn would generate by his new entity, Dunn Law, APC.

19       59.   As early as February 2012, Dunn began passing off Dunn Law, APC as

20  "The Cochran Firm Los Angeles."  On or about March 1, 2012, at the behest of

21  Cherry, Givens, and TCF-CCGSS, Dunn filed a Fictitious Business Name Statement in

22  the Los Angeles County Recorder's Office for "The Cochran Firm Los Angeles" (the

23  "DBA Statement"). The DBA Statement falsely represented that Dunn Law, APC was

24  the sole registered owner of "The Cochran Firm Los Angeles," however, Dunn Law,

25  APC is not a party to the 2007 partnership agreement nor the operative 2010 amended

26  partnership agreement for TCFLA-GP.

27       60.   On or about February 16, 2012, at the behest of Cherry, Givens, and TCF-

28  CCGSS, Dunn filed another Fictitious Business Name Statement in the Los Angeles

AMENDED COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS RANDY H. MCMURRAY, P.C.
AND RANDY H. MCMURRAY

1  County Recorder's Office for "The Cochran Firm California."  This statement
2  represented that Dunn Law, APC was the sole registered owner of "The Cochran Firm
3  California."  Without McMurray's knowledge, Dunn established bank accounts for
4  "The Cochran Firm California" at Bank of the West.

5       61.  In June and July 2012, at the behest of Cherry, Givens, and TCF-CCGSS,
6  Dunn and Barrett filed Notices of Firm Name Change in several TCFLA-GP cases then
7  pending in both state and federal court fraudulently stating that TCFLA-GP had
8  "changed its name" to The Cochran Firm California.  Dunn and Barrett filed those
9  notices with the intent of inducing the opposing parties in those cases to write any
10  settlement checks to be paid to the order of "The Cochran Firm California," an entity
11  controlled by Dunn, even though TCFLA-GP funded and litigated those cases.

12  **E.**  **FRAUDULENT COMMUNICATIONS TO BANK IN ATTEMPT TO**
13       **OBTAIN TCFLA-GP'S ASSETS**

14       62.  On or about June 12, 2012, in order to take control of TCFLA-GP's bank
15  accounts, Dunn sent by email to a Bank of America representative a PDF scan of the
16  fraudulent DBA Statement.  Dunn represented in his email that The Cochran Firm Los
17  Angeles was exclusively owned by Dunn Law, APC.

18       63.  As a result of Dunn's action, McMurray, who was a signatory on all bank
19  accounts, was prevented from accessing firm funds.

20  **F.**  **FRAUDULENT DIVERSION OF TCFLA-GP'S CASE SETTLEMENT**
21       **CHECKS INTO DUNN'S ENTITY**

22       64.  As part of the fraudulent takeover of TCFLA-GP, and at the behest of and
23  direction of Cherry, Givens, and TCF-CCGSS, Dunn siphoned hundreds of thousands
24  of dollars in case settlement proceeds properly belonging to TCFLA-GP to his Dunn
25  Law, APC entity, operating as "The Cochran Firm California." Dunn did the following
26  acts without McMurray's knowledge, and with the intent to deprive McMurray and
27  TCFLA-GP of funds that were due them.

28

65.   For example, on or before April 18, 2012, Dunn sent an IRS form W9 by email to opposing counsel in *Washington v. City of Los Angeles,* in which TCFLA-GP represented Plaintiff, so that opposing counsel could write a $950,000 settlement check in the case.  Dunn knowingly and falsely identified TCFLA-GP as the pertinent taxpayer and, on April 18, 2012, deposited the settlement check into a Bank of the West bank account belonging to "The Cochran Firm California," rather than the Bank of America account belonging to TCFLA-GP.  Dunn retained the share of fees that should have gone to reimburse TCFLA-GP and pay McMurray.

66.   On or about June 13, 2012, Dunn wrote two checks totaling $87,570 drawn directly on TCFLA-GP's client trust account.  The memo lines on the checks indicate that the funds represented settlement proceeds from two cases of TCFLA-GP named *Young* and *Wright*. Dunn fraudulently made out the checks to the order of "The Cochran Firm" to hide his intent to deposit the checks into a different bank account, knowing that if McMurray were to see the checks he would be less likely to investigate.  Dunn then deposited those checks into the secret bank account of "The Cochran Firm California," maintained at Bank of the West.

67.   On information and belief, at the behest of Cherry and Givens, Dunn and Barrett fraudulently diverted settlement proceeds worth hundreds of thousands of dollars from many more of TCFLA-GP's cases into the bank accounts of "The Cochran Firm California" owned by Dunn's entity Dunn Law, APC and have refused to reimburse TCFLA-GP and McMurray for such proceeds.  The sources of this information include the list of pending cases of TCFLA-GP, conversations with the court-appointed Receiver, David Ray, opposing counsel in some of those cases, and representations made by Dunn in Los Angeles County Superior Court Case No. BC 480203, the co-pending case involving the dissolution of TCFLA-GP. For example, Dunn and Koplow, directed by Cherry, secretly misappropriated McMurray's share of the proceeds in the case of *Natasha Brown*, settled on or about October, 2011 for $1,500,000.00.

68.   Also, on or about October 8, 2012, at Cherry and Givens' direction, Barrett and Dunn knowingly and fraudulently used a similar scheme as in the preceding paragraph to direct a $750,000 settlement check made payable to TCFLA-GP from the *Jennings v. Days Inn* matter to be deposited into the bank account for The Cochran Firm California.

## G.   FRAUDULENT WIRE COMMUNICATIONS DIRECTING THE DISRUPTION OF MCMURRAY'S ABILITY TO PRACTICE LAW

69.   As part of Counterdefendants' plan to take over TCFLA-GP and siphon its assets into Dunn's competing entity so as to protect and further the "The Cochran Firm" scheme, Cherry, Givens, and TCF-CCGSS directed Dunn and Dunn's agent, Jim Oates ("Oates"), to disrupt TCFLA-GP's IT systems and McMurray's ability to trace assets, cases and practice law. The purpose of these actions was to compel McMurray to permanently leave the physical premises of TCFLA-GP, leaving Dunn in day-to-day control. The following are examples of actions taken to this end:

70.   On or about February 9, 2012, at the behest and direction of Cherry, Givens, and TCF-CCGSS and communicated via email or telephone, Dunn directed Oates to block McMurray's outgoing and incoming emails.  Oates accomplished this via the internet.

71.   On or about June 14, 2012, at the behest and direction of Cherry, Givens, and TCF-CCGSS, communicated via email or telephone, Dunn directed Oates to arrange with Go Daddy to transfer the domain name "thecochranfirmlosangeles.com" away from TCFLA-GP to either Dunn Law, APC or TCF-CCGSS.  Oates accomplished this via the internet or telephone.

72.   The purpose of the transfer was to create a false basis for allegations against McMurray and TCFLA-GP in this lawsuit, filed shortly thereafter. The first sentence of allegations in this lawsuit states: "This action arises from the unauthorized use of the trade name and trademark THE COCHRAN FIRM LOS ANGELES and the domain name "www.thecochranfirmlosangeles.com". Plaintiff knew that the domain name was

1    transferred by Oates and that McMurray had no remaining control or participation in

2    The Cochran Firm Los Angeles. The lawsuit was brought for the sole reason to

3    diminish any asset distribution to McMurray in the pending dissolution proceedings.

4    Both Dunn and Barrett conspired with TCF-CCGSS in filing suit against their own

5    partnership.

6    **H.    FRAUD AGAINST MCMURRAY, EDD, AND IRS**

7        73.   On or about February 9, 2012, Dunn, at the direction of Cherry, established

8    an account with the Employment Development Department of the State of California

9    ("EDD") identifying all former TCFLA-GP employees that are now employees of the

10   "reestablished" Los Angeles office of The Cochran Firm, Dunn Law, APC. From

11   February 9, 2012 to date, notwithstanding the collection of EDD taxes from his

12   employees' paychecks, Dunn failed and refused to remit payroll taxes to the EDD.

13   Dunn, at the behest of Cherry, intentionally did not report himself or his entity as a

14   responsible party for taxation purposes.

15       74.   On April 18, 2012, in response to a request from the City of Los Angeles

16   for a completed W-9 identifying for tax purposes the name and tax ID number of the

17   entity to whom the $950,000 settlement amount mentioned above would be paid, at the

18   direction of Cherry and Givens and in conspiracy therewith, Counterdefendant Dunn

19   transmitted by means of mail and email to the City of Los Angeles an IRS form W-9

20   identifying TCFLA-GP and its federal tax ID number. Dunn intended that the City of

21   Los Angeles would transmit the form by means of the mail or wire to the IRS. His

22   sending the form constituted a fraudulent representation made for the purposes of (a)

23   inducing the IRS to look to TCFLA-GP and McMurray for the tax liability associated

24   with the settlement payment, despite the fact that Dunn intended to deposit the check

25   into the bank account of a separate entity under his sole control; and (b) defrauding the

26   United States and evading tax liability in violation of 26 U.S.C. sections 7201 and

27   7206(a).

28

75.   On information and belief, other fraudulent W-9 forms were issued using TCFLA-GP's tax ID number in order to impose tax liability on McMurray for earnings he never received and for the purpose of tax evasion. As a result of this fraudulent W-9 reporting, the IRS has placed a lien in excess of $160,000.00 on McMurray's assets.

76.   In or around February of 2013, the EDD issued a final notice of levy addressed to TCFLA-GP and  McMurray to pay over $ 40,000 in EDD taxes and warning that McMurray's assets would be levied. The notice was sent to the old address, currently occupied by Counterdefendants' firm. Dunn did not pay the amount due and deliberately concealed the letter from McMurray.

77.   On February, 21, 2013 the EDD levied all McMurray's bank accounts, including his joint spousal account and children's accounts where McMurray was a co-signatory. The entire family was abruptly left with no access to funds. McMurray notified Dunn and made a demand that the tax debt be paid; Dunn did not pay. In response to an EDD inquiry Dunn, at the direction of Cherry, falsely stated that McMurray was a partner of the responsible entity.  Dunn clearly knew that the EDD would proceed with the levy and seize funds from McMurray's personal and family accounts. Dunn's letter was faxed to the EDD on March 3, 2013 for the sole purpose of causing the EDD to execute the improper levy.

78.    At the direction of Cherry and Givens and in conspiracy therewith, Counterdefendant Dunn transmitted by telephonic facsimile a letter to the EDD falsely stating that TCFLA-GP existed and was active until May 22, 2012, and that McMurray was its managing and reporting partner up to that date. As a result EDD has liened any future tax refunds due McMurray.

///

AMENDED COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS RANDY H. McMURRAY, P.C. AND RANDY H. McMURRAY

## FIRST COUNTERCLAIM FOR RELIEF

### (Civil RICO 18 U.S.C. §§ 1962(c) and (d) The Cochran Firm, P.C. as RICO enterprise

### Against Counterdefendants TCF-CCGSS, Cherry, Givens, Dunn, Barrett, and Koplow.

79.     McMurray re-states and re-alleges the facts set forth in all the paragraphs above as though fully set forth herein.

80.     The Cochran Firm is a RICO enterprise ("the Enterprise")[1]. The Second Amended Complaint (SAC ¶ 7), identifies the Enterprise as an Alabama corporation, but it is not a registered entity in Alabama.  If it is not a corporation, the Enterprise is an ongoing association-in-fact organization comprised of Cherry and Givens, associated for the common purpose of negotiating with attorneys and law firms to establish Cochran Firm law offices in various cities, acquiring and asserting the "THE COCHRAN FIRM" trademark, licensing the trademark, collecting license fees and promoting the nationwide firm through internet websites.  This structure and lawful activity of the association-in-fact are distinct from the pattern of racketeering described in these Amended Counterclaims.  The Enterprise has functioned as a continuing unit managed by Cherry and Givens for at least 10 years and continues into the future.  With offices, attorneys and clients in several states such as Alabama, California, Florida and Tennessee, both the lawful activity and pattern of racketeering effect interstate commerce.

81.     Counterdefendants Cherry and Givens as the managers conduct the affairs of the Enterprise, with the aid of co-conspirators, Dunn, Barrett, and Koplow, who are associated therewith.  These five individuals have been acting in concert and conspiracy and as agents of one another in conducting the affairs of the Enterprise in many states utilizing fraudulent interstate mail and wire communications, as described in the factual background of these Amended Counterclaims.

---

[1] Note, Plaintiff, The Cochran Firm P.C. is *not* a defendant in this counterclaim.

82.     From 1999 to the present, Cherry and Givens, with the aid of co-conspirators Dunn, Barrett and Koplow, also conducted the affairs of the Enterprise through acts of mail fraud, wire fraud and bank fraud, to induce attorneys to participate in the law firm, and to falsely believe they are partners in the firm, so they build their practices and the reputation of the firm. The racketeering activity differs from the lawful activities by fraudulently ousting attorneys that have been led to believe they are partners, diverting funds, defrauding creditors by transferring away assets and receivables of the attorney or local firm, defrauding federal and state tax authorities including the IRS and California EDD, and depriving clients of recourse and recovery if they have negligence, malpractice or other claims against the Enterprise.

83.     Cherry and Givens are shareholders and partners of TCF-CCGSS and THE FIRM, Inc. and other entities that are associated with and conduct the affairs of the Enterprise.

84.     Dunn is a Partner in TCFLA-GP, which purports to be associated with the Enterprise. Dunn is further associated with the Enterprise by cooperating and conspiring with Cherry and Givens to remove McMurray from TCFLA-GP, divert settlement funds therefrom, fraudulently impose IRS and EDD fees on McMurray and usurp the partnership bank account as detailed in the factual background above.

85.     Barrett is associated with the Enterprise by practicing law in TCFLA-GP and by becoming a partner in the firm with McMurray and Dunn.  Barrett agreed to join the conspiracy with Cherry and Givens, agreed to commit acts of mail fraud and wire fraud knowing these acts were part of a pattern of racketeering. Barrett engaged in wire fraud and mail fraud in voting McMurray out of McMurray's own firm, aiding Counterdefendants in re-establishing the Los Angeles Office, and diverting TCFLA-GP partnership asserts to the Enterprise's newly established Los Angeles Office.

86.     Koplow's association with the Enterprise arises from her service as the chief financial officer of TCFLA-GP. Sometime in 2008, Koplow joined the conspiracy

1  with Cherry and Givens, and engaged in fraudulent acts described herein that she knew

2  were part of a pattern of racketeering. In particular, on information and belief as learned

3  from a forensic accountant's report commissioned by the Receiver in the state case, in

4  2008, 2009, and 2010, Koplow recorded bogus loans to McMurray in the partnership's

5  tax returns in order to disguise funds fraudulently transferred to Cherry, Givens, and

6  Dunn for which she had not issued 1099s and K-1s. Also, in February 2012, Koplow

7  facilitated the fraudulent transfer of funds from TCFLA-GP to the Enterprise, and

8  fraudulently caused the tax liabilities that were incurred by The Cochran Firm

9  California (the "reestablished" entity controlled by Counterdefendants) to be reported as

10  liabilities of McMurray. Koplow also passed on confidential information to Cherry and

11  Givens to enhance the Enterprise's revenue and position of control over TCFLA-GP.

12      87.    Commencing at least as early as 2006 with respect to McMurray (and as

13  early as 2003 with respect to other victims such as attorney Julian Bolton) and

14  continuing to the present, these Counterdefendants engaged in a series of continuous,

15  related acts to induce in attorneys and clients the false belief that the attorneys are

16  partners in a national firm. These Counterdefendants engage in wire fraud by

17  advertising the Enterprise firm on the internet as a single nationwide partnership. Later,

18  when the attorney or client asserts rights or benefits pertaining to the partnership, the

19  sham is revealed that there is no nationwide partnership: clients are deprived of the

20  recourse they thought they had in dealing with a nationwide firm; and attorneys lose

21  their position, receivables and more. By acts of wire fraud, mail fraud and bank fraud,

22  these Counterdefendants oust the attorneys from the firm, usurping their assets,

23  receivables, bank accounts, and cases.

24      88.    The scheme's very nature requires that a number of years must pass

25  between stages of execution of the plan. Thus, the predicate acts in furtherance thereof

26  are continuous notwithstanding seeming gaps of years.  The attorneys build their

27  practices and clients' litigation takes years to come to fruition. The steps that build on

28  one another over time and have commonality, so the acts are continuous and related.

1  They are not isolated acts; rather they have the same method of commission through

2  fraudulent representation by mail, wire or internet; the same goal and result of

3  misleading and defrauding attorneys and clients; and depriving the victim – lawyer and

4  client alike – of recourse and monies due.

5       89.    By the acts alleged with specificity in the factual background and

6  accompanying RICO statement, Counterdefendants defrauded McMurray and others.

7  On April 21 2003, Cherry and Givens mailed a letter to McMurray fraudulently

8  representing that he had been elevated to name partner of the local office of the Cochran

9  Firm.  McMurray's status was advertised on the website and firm letterhead.

10  Nonetheless, unbeknownst to McMurray, on September 30, 2004 Cherry and Givens

11  sent a contradictory representation to the State Bar indicating McMurray was not a

12  partner.

13       90.    McMurray was informed in mid-2006 that Counterdefendants no longer

14  wanted to finance the Los Angeles office and offered to McMurray the right to acquire

15  and take over the office and practice as "The Cochran Firm Los Angeles," in exchange

16  for assuming the office's debts and liabilities.  The representations were fraudulent, as

17  Counterdefendants never intended to convey the foregoing rights to McMurray.

18       91.    In or around early 2010 Counterdefendants fraudulently concealed from

19  McMurray that his trusted chief financial officer Koplow had joined the conspiracy and

20  at the direction of Cherry and Givens defrauded the IRS with fraudulent

21  characterizations of income earned by TCFLA-GP, attributing excess income to

22  McMurray that should have been attributed to others.

23       92.    On or around September 24, 2007 and again on June 7, 2011 by fraudulent

24  wire communication, Cherry and Givens caused the cover sheet and abstract of the

25  "Assignment" of the '153 Reg. to give the appearance that the new owner of the

26  registration was the Enterprise, when the assignment was to TCF-CCGSS. Cherry and

27  Givens use this fraudulent appearance to assert the trademark on behalf of the

28

1   Enterprise, against McMurray and presumably others, when it does not hold the rights

2   asserted.

3         93.    On or about February 9, 2012, Counterdefendant Dunn, at the behest of

4   Cherry and Givens and in conspiracy therewith, transmitted by means of the mail or

5   interstate wires to the Internal Revenue Service ("IRS") in the District of Columbia

6   false and fraudulent representations that McMurray was the responsible and reporting

7   party with regard to the payroll tax liabilities generated from a payroll bank account

8   that had been established by Dunn on February 9, 2012 without McMurray's

9   knowledge. Under the direction of Cherry and Givens, Dunn made these false and

10   fraudulent representations to the IRS for the purpose of inducing the IRS to look to

11   McMurray for the payroll tax liabilities for which Dunn was responsible on behalf of a

12   separate entity under Dunn's – and not McMurray's – sole control.

13         94.    On or about February 9, 2012, Counterdefendant Dunn, at the direction of

14   Cherry and Givens and in conspiracy therewith, transmitted by means of the mail or

15   interstate wires to the EDD that falsely and fraudulently represented that

16   Counterclaimant McMurray was the responsible and reporting party with regard to the

17   payroll tax liabilities generated from a payroll bank account that had been established by

18   Dunn on February 9, 2012 without McMurray's knowledge. Dunn made these false and

19   fraudulent representations to the EDD for the purpose of inducing the EDD to look to

20   McMurray for the payroll tax liabilities for which Dunn was responsible on behalf of a

21   separate entity under his sole control.

22         95.    On or about March 1, 2012, At the direction of Counterdefendant Cherry

23   and in conspiracy therewith, Counterdefendant Dunn placed in the mail to the Office of

24   the Recorder of Los Angeles County, and caused to be published in a newspaper of

25   general circulation in the county, a Fictitious Business Name Statement ("DBA

26   Statement") that falsely and fraudulently represents that Dunn Law, APC, an entity

27   solely owned by Dunn, is the sole owner of an entity called "The Cochran Firm Los

28   Angeles."

96.     On or about April 18, 2012, at the behest of Cherry and Givens and in conspiracy therewith, Counterdefendant Dunn, without authorization, caused a $950,000 settlement check for TCFLA-GP to be deposited into the bank account that Dunn had secretly established for his competing entity, The Cochran Firm California, which was then unknown to McMurray. The settlement check had been received in connection with the *Washington v. City of Los Angeles* case that belonged to TCFLA-GP. Dunn knew at the time that the settlement check was written to be paid to the order of "The Cochran Firm," by which was meant TCFLA-GP, which had prosecuted the matter, and that it was meant to be deposited into the latter entity's client trust account.

97.     On or about May 22, 2012, Counterdefendant Barrett, acting upon the instructions of Cherry, Givens, and Dunn, sent via email to McMurray a letter of resignation representing that Barrett was resigning from the TCFLA-GP partnership. Barrett concealed from McMurray the fact that his purpose in resigning from the partnership was to enable Dunn to be co-liquidator of the partnership and allow him to use that status to fraudulently divert TCFLA-GP's assets into The Cochran Firm California.

98.     On or about October 8, 2012, without McMurray's knowledge, Counterdefendant Barrett fraudulently deposited a $750,000 settlement check from the *Jennings v. Days Inn* matter (in which TCFLA-GP represented the plaintiff) that was intended for and payable to TCFLA-GP, to be deposited into the Bank of the West bank account for Dunn's The Cochran Firm California. Barrett knew at the time that the settlement check had been made out to TCFLA-GP. The check had been endorsed to The Cochran Firm Los Angeles pursuant to a lien placed on the case by Randy McMurray as liquidator. Moreover, on information and belief, in order to obtain the check, Barrett fraudulently submitted an IRS W-9 form identifying TCFLA-GP as the payee for tax purposes, in similar fashion as in the *Washington* matter, by which Barrett intended to pass off the associated tax liabilities to TCFLA-GP and McMurray.

99.    On or before April 18, 2012, at the direction of Cherry and Givens and in conspiracy therewith, Counterdefendant Dunn transmitted by means of the mail and email to the City of Los Angeles an IRS form W-9 return that listed the name of TCFLA-GP and identified its federal tax ID number. It was sent in response to a request for a completed W-9 identifying for tax purposes the name and tax ID number of the entity to whom the $950,000.00 settlement amount mentioned above would be paid. Dunn intended that the City of Los Angeles would transmit the form by means of the mail or internet to the IRS. Dunn's sending the form constituted a fraudulent representation made for the purpose of inducing the IRS to look to TCFLA-GP and its managing partner, McMurray, for the tax liability associated with the settlement payment, despite the fact that Dunn intended to surreptitiously deposit the check into the bank account of a separate entity under his sole control. Dunn made this fraudulent representation for the purpose of defrauding the United States and evading tax liability in violation of 26 U.S.C. sections 7201 and 7206(a).

100.    Throughout 2012, particularly, for example, in February and April of 2012, Dunn, at Cherry and Givens' directions, made by mail and telephone, several false and fraudulent representations to the EDD and IRS, consisting of payroll bank account records, fraudulent W-9 forms, and other statements, indicating that income that had actually been received and retained by The Cochran Firm California and TCF-CCGSS, including settlement proceeds and retained payroll tax withholdings, had instead been received by TCFLA-GP and that McMurray was the responsible party for the pertinent tax liabilities. In February of 2013, Dunn, via telephone and facsimile transmission, fraudulently confirmed to an EDD representative that McMurray was responsible for these liabilities.

101.    McMurray was injured in his business and property by loss of his practice, loss of his investment in assuming the firm debt and $900,000 loan for the rights he did not receive, IRS taxes levied against him, EDD charges that are not for his employees, liens on any future tax refunds, diverted cases and bank accounts, loss of reputation.

102.   These Counterdefendants' pattern of racketeering activity in furtherance of their unlawful scheme has been directed not only against McMurray, but also against others.

103.   For example, Attorney Julian T. Bolton was victimized by predicate acts in furtherance of the unlawful scheme, in a pattern of acts uncannily similar to those concerning McMurray. Bolton relied on fraudulent letters from Cherry and Givens in 2001 informing him that he was a partner, and then managing partner, of The Cochran Firm in Tennessee. He built the law practice, developing accounts receivable over several years, and received a percentage of receipts as managing partner. Bolton was injured when in May 2004 Counterdefendants denied that he had true partnership and/or managing partnership status in the firm, then ousted him, depriving him of his ability to practice in the firm whose goodwill he had built. Significantly, he was deprived of his income earned as managing partner, when Counterdefendants Cherry and Givens directed the establishment of a separate office under the same name using the trademark and fraudulently diverted Bolton's firm's receipts to the new firm – and refused to pay Bolton the percentage he had earned as managing partner. Bolton was deprived of monies earned and the benefit of the goodwill he had established in the practice. By the methodology of the scheme, Cherry and Givens led Bolton to believe that he was a partner – a managing partner, no less – and encouraged him to build up the firm and receivables but never executed a formal partnership agreement. Thus, although Bolton challenged his ouster, the intentional, fraudulent steps of Cherry and Givens' scheme deprived him of the ability to recover from his injuries caused thereby.

104.   Between August 1, 2003 and June 14, 2004 Cherry, through his agents, made fraudulent representations that the Enterprise had an office in Memphis, Tennessee to induce Hattie M. Neal to engage the Enterprise to litigate her wrongful death case. However, when she later brought an action against the Enterprise for professional negligence, Cherry, through his agents, indicated in interrogatory responses on March 24, 2006 that their firm, TCF-CCGSS is an independent firm that is not "The

AMENDED COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS RANDY H. MCMURRAY, P.C. AND RANDY H. MCMURRAY

Cochran Firm". By waiting until the statute of limitations expired before informing Ms. Neal and the court that the law firm she sued was unrelated to the law office that injured her and which she had been led to believe was a local office of a larger entity, Cherry and Givens denied Ms. Neal recovery for damages for her claim against "The Cochran Firm."

105.   Because many clients may have likewise relied on the fraudulent representation describing The Cochran Firm as if it were a single national law firm communicated by wire on the Counterdefendants' websites, there are likely other clients similarly deceived and injured.

106.   Creditors of TCFLA-GP where McMurray practiced and where he was managing partner, were on information and belief injured as a result of the diversion of receipts and accounts receivable away from TCFLA-GP to Counterdefendants' newly "reestablished" office that used the identical "The Cochran Firm Los Angeles" business name.

107.   The Internal Revenue Service ("IRS") was injured by being deprived of tax payments due from these Counterdefendants, who knowingly and in concert reported to the IRS McMurray as accountable party, using his tax ID in connection with payment of income tax and employee withholdings for the new firm they were operating without him as the "reestablished" Cochran Firm Los Angeles.  These Counterdefendants were well aware that McMurray had not incurred those liabilities and did not receive the income or withholdings reported and he did not possess the funds to pay the IRS.

108.   The Employment Development Department of the State of California ("EDD") was injured by being deprived of tax payments due from these Counterdefendants who knowingly and in concert identified to the EDD McMurray's tax ID as responsible for payroll tax withholdings for employees of the Counterdefendants' reestablished Cochran Firm Los Angeles. As these Counterdefendants knew, McMurray did not receive the withholdings reported and did not have the finances to pay the EDD.

109.   Because of the similarities of the schemes that deprived Bolton and McMurray of their respective incomes, receivables and firm goodwill, on information and belief there are likely other attorneys injured by the same pattern of conduct, not currently known to McMurray.

110.   The series of predicate acts of mail fraud, wire fraud and bank fraud were both related and continuous, forming a pattern of racketeering activity.   The various fraudulent letters and wire communications by these Counterdefendants are all related because they all have the same or similar purposes to mislead clients and attorneys into believing there is a single nationwide partnership. They have similar results in that the victims are deprived of money they were due or would have received absent the fraud and may have additional loss and injury.  The participants in the fraud are the Counterdefendants.  The victims are those who work for or hire the Enterprise.  The method of commission is use of misleading internet, mail fraud, wire fraud and concealment. The predicate acts are not isolated events.

111.   The predicate acts applied against various victims are continuous because the scheme is carried out over a number of years through a series of steps to induce and eventually defraud. The conduct by its nature projects into the future with a threat of repetition.

112.   The unlawful acts of Counterdefendants have proximately caused financial loss and injury to the business and property of Randy H. McMurray, Randy H. McMurray, P.C., Julian Bolton, Hattie Neal, the IRS, California EDD and others who relied on fraudulent misrepresentations promulgated by Counterdefendants.

## SECOND COUNTERCLAIM FOR RELIEF FOR FRAUD
### [Against TCF-CCGSS, Cherry, Givens, Dunn, Koplow and Barrett]

113.   McMurray re-states and re-alleges the facts set forth in all the paragraphs above as though fully set forth herein.

114.   On or about the beginning of 1999 through 2007, Counterdefendants Cherry and Givens, on behalf of TCF-CCGSS, falsely and fraudulently continued to

1  affirmatively represent to McMurray that McMurray was a partner of their entity with

2  the full legal rights of a law firm partner as understood under the uniform partnership

3  and California business law. These representations were both verbal, in writing

4  memorialized in the April 21, 2003 letter signed by Cochran, Givens, and Cherry, and

5  implied through Cherry and Givens' encouraging McMurray to invest time, labor,

6  resources, effort, and goodwill into their firm. Their representations were also implied

7  through Counterdefendants' actions in actively advertising McMurray as their managing

8  partner.

9       115.   During this same time period, Cherry and Givens, on behalf of TCF-

10  CCGSS, falsely and fraudulently concealed the registration by Cochran on behalf of

11  Cherry and Givens of the "The Cochran Firm" mark, the assignment by Cochran's

12  estate of that mark, and Cherry and Given's claim to that mark on behalf of TCF-

13  CCGSS.

14       116.   For example, in December of 2006, Cherry and Givens proposed to

15  McMurray that McMurray acquire ownership of their Los Angeles operation in

16  exchange for assuming the office's debts, assuming liability for a pending lawsuit

17  against the office, assuming the lease, and financing its operations.

18       117.   In reliance on Cherry and Givens' representations and with their consent, in

19  February of 2007, McMurray formed The Cochran Firm Los Angeles, a General

20  Partnership, with Counterdefendant Dunn. Also in reliance on Cherry and Givens'

21  representations and with their consent, the 2007 partnership agreement stated that

22  McMurray and Dunn would have an independent right to use the "Cochran" name

23  between themselves or in conjunction with others.

24       118.   In May of 2007, in reliance on Cherry and Givens' representations that

25  McMurray was now owner of the Los Angeles office, and to his own detriment,

26  McMurray obtained a $900,000 commercial loan for TCFLA-GP's use and secured it by

27  placing his own personal residence under a deed of trust as collateral.

28

AMENDED COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS RANDY H. MCMURRAY, P.C.
AND RANDY H. MCMURRAY

119.   As partners, Cherry and Givens owed McMurray a duty to disclose all material information, including that his ownership of the Los Angeles office would in fact not include the right to use the "Cochran" name. Cherry and Givens owed McMurray a duty to disclose that on or about September of 2007 they had secretly obtained an assignment of the "The Cochran Firm" mark and '153 Reg. from the Estate of Johnnie L. Cochran Jr.

120.   Had McMurray known of the existence of the trademark registration and assignment, he would not have assumed liabilities, invested his own money, and placed his residential home at risk to acquire an entity having no rights to use the Mark and "Cochran" name, or he would not have financed the Los Angeles office or made additional investments without obtaining contractual rights to use the mark.

121.   When Cherry and Givens made representations to McMurray that he was a partner and an independent owner of the Los Angeles office and concealed their true intentions to secretly maintain control of the Los Angeles office by their possession of an assignment of the Mark, they knew those representations to be false and misleading and those representations were made by Counterdefendants with the intent to defraud and deceive McMurray and with the intent to induce McMurray to act in the manner alleged herein.

122.   When Cherry and Givens made these fraudulent representations to McMurray they had no intention to honor McMurray's rights as a partner as is evidenced by later disclosure of their claim of exclusive control over the Mark.

123.   The representations made by Cherry and Givens and the implications of their actions were in fact false and deceptive. The true facts were that Cherry and Givens intended that McMurray to make large investments and that they would then seize and take over the Los Angeles office and its assets by use of the Mark.

124.   McMurray did not discover the federally registered trademark until February 6, 2012 when he first received a cease and desist letter from Cherry and Givens on behalf of TCF-CCGSS.McMurray's reliance on Cherry and Givens'

1  representations was justifiable because McMurray was in a partnership and fiduciary

2  relationship with Cherry and Givens.

3      125.  On January 22, 2012, Counterdefendants Cherry, Givens, and Dunn had a

4  meeting in South Beach, Florida in which they devised a fraudulent scheme to take over

5  TCFLA-GP and divert its assets into their own entities. In furtherance of this scheme, in

6  February of 2012, Dunn incorporated his own professional corporation doing business

7  as "The Cochran Firm California," he fraudulently opened a payroll account for "The

8  Cochran Firm Los Angeles" and reported McMurray's name as the responsible party

9  for tax purposes, and he recorded a fraudulent fictitious business name statement falsely

10  stating that Dunn's entity, Dunn Law, APC was the sole owner of The Cochran Firm

11  Los Angeles. Between February of 2012 and the present day, Dunn and Barrett diverted

12  referral fees and settlement checks intended for TCFLA-GP to The Cochran Firm

13  California and TCF-CCGSS. Counterdefendants deliberately concealed from

14  McMurray these actions and their intent to take over TCFLA-GP and divert its assets.

15      126.  Had McMurray known of Counterdefendants' fraudulent scheme and

16  actions, he would have sooner taken steps to prevent the diversion of TCFLA-GP's

17  assets. McMurray did not suspect that Counterdefendants would take these actions, in

18  justifiable reliance on his fiduciary relationship with Dunn and Barrett as partners.

19      127.  In 2008 and 2009, Counterdefendant Koplow, at the direction of Cherry,

20  Givens, and Dunn, falsely and fraudulently inserted into McMurray's corporate tax

21  returns records of bogus, non-existent loans purportedly from McMurray to TCFLA-

22  GP. Koplow buried the loans in the middle of lengthy tax returns with the intent to

23  make them difficult to detect. Koplow concealed these bogus loans, intending that

24  McMurray would rely on Koplow due to her duties to him as an employee and financial

25  records keeper, and with the purpose of passing Counterdefendants' tax liability on to

26  McMurray without disclosure.

27      128.  In or around September of 2011, Counterdefendant Koplow, at the

28  direction of Cherry, Givens, and Dunn, falsely and fraudulently represented to

1   McMurray that TCFLA-GP would not be able to make payroll and that McMurray

2   should make an urgent loan to the partnership to address the shortfall. Koplow made the

3   request knowing that the partnership had adequate funds to make payroll and knowing

4   that Cherry and Givens would soon oust McMurray and take control of TCFLA-GP's

5   assets. In reliance on Koplow's misrepresentation, McMurray made an urgent $115,000

6   loan to the partnership. Koplow subsequently fraudulently mis-recorded that loan in the

7   partnership's accounting records as a repayment of the abovementioned bogus loans

8   from the partnership to McMurray.

9        129.   McMurray's reliance on Koplow's representations were justifiable due to

10  the fiduciary duties and duties of loyalty that Koplow owed McMurray as an person

11  handling all McMurray's finances. McMurray never recouped the money he invested

12  and was damaged by the deceit.

13       130.   As a result of the misrepresentations and concealment herein alleged,

14  Counterclaimants McMurray have been damaged in an amount to be proved at trial.

15       131.   In doing the herein-alleged acts, Counterdefendants acted with oppression,

16  fraud, and malice, and McMurray is thus entitled to punitive damages.

### THIRD COUNTERCLAIM FOR RELIEF

### Tortious Interference With Prospective Business Advantage Against

### Counterdefendants, [TCF-CCGSS, Cherry, Givens, Dunn, and Barrett]

20       132.   McMurray re-states and re-alleges the facts set forth in all the paragraphs

21  above as though fully set forth herein.

22       133.   An economic relationship exists between McMurray and potential clients

23  and other members of the public containing the probability of future economic benefit to

24  McMurray. An economic relationship also existed between McMurray as managing

25  partner of TCFLA-GP and the employee attorneys and staff of TCFLA-GP (until the

26  relationship was severed by these counterdefendants upon Dunn's and Barrett's

27  "conversion" of the TCFLA-GP firm to The Cochran Firm California under the

28  direction of and in concert with Cherry, Givens and TCF-CCGSS).

AMENDED COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS RANDY H. MCMURRAY, P.C.
AND RANDY H. MCMURRAY

134.   These Counterdefendants have knowledge of the existence of the foregoing relationships and potential relationships.

135.   Counterdefendants engaged in a series of intentional acts as described herein, designed to disrupt the foregoing relationships. Counterdefendants have interfered with McMurray's prospective economic advantage and prospective business relations using wrongful means and for improper purposes, as described herein.

136.   The conduct and actions of Counterdefendants was malicious, willful, wrongful, intentional, and without any right or entitlement whatsoever, with the purpose and intent to injure McMurray.

137.   As a direct and proximate result of Counterdefendants' conduct, actual disruption of the relationships has occurred.

138.   McMurray has suffered damages to his business and property proximately caused by the acts of Counterdefendants.

## FOURTH COUNTERCLAIM FOR RELIEF
### Cancellation Of Trademark Registration Under 15 U.S.C. §§ 1051 *Et Seq*.
### Against "The Cochran Firm, P.C." and TCF-CCGSS

139.   McMurray re-states and re-alleges the facts set forth in all the paragraphs above as though fully set forth herein.

140.   McMurray owns valuable rights in the mark THE COCHRAN FIRM in connection with services similar or identical to those identified in US Trademark Registration No. 2,930,153 (both the registration and its precursory application referred to herein as the "'153 Reg."). McMurray's renown stemming from his many years' work as a trial lawyer, including as an associate and partner of Cochran, and as a member of Cochran's law firm in Los Angeles, which has long done business as "The Cochran Firm", as well as his continuing work with and management of the Los Angeles firm after the death of Cochran and formation of a new law partnership under the "The Cochran Firm Los Angeles" name, extends throughout the Southern California region and North America.

141.   In 2004, Cochran executed a "Grant and Assignment" document in which he assigned his rights and interest in his law practice, including the goodwill associated therewith, to a trust entity.

142.   According to the document, Cochran's rights to the mark THE COCHRAN FIRM, including the then-pending trademark application that matured into the '153 Reg., were not assigned as part of the Grant and Assignment.  Cochran never executed or recorded an assignment of his rights in the pending '153 Reg., which was filed in his name as an individual and remained so until his death.

143.   In July 2004, a Declaration containing several unsupported allegations of fact was filed in the Trademark Office in support of Cochran's application to register THE COCHRAN FIRM, in order to show the mark had acquired distinctiveness and was registrable on the Principal Register.

144.   Although it was ostensibly signed by Cochran, the signature on the Declaration is not his true signature, thus someone else and not he executed the Declaration.

145.   The mark THE COCHRAN FIRM was not used in commerce since at least as early as May 1, 1998, as averred in the Declaration.

146.   The mark THE COCHRAN FIRM was not "extensively advertised on TV, radio, and in print media" since at least as early as 1998, as averred in the Declaration.

147.   National and local advertising expenditures promoting the mark THE COCHRAN FIRM in connection with applicant's legal services "from 1998 until and including the first quarter of 2004" were not in excess of  USD$ 10,000,000.00, as averred in the Declaration.

148.   The Declaration's remaining averments of fact are also untrue.

149.   At the time of his death, the '153 Reg. was unassigned, in Cochran's name as an individual.

150.   The business and goodwill in Cochran's law practice were not assigned or otherwise transferred to the estate from the trust. On information and belief, following

Cochran's death, ownership of the '153 Reg. passed to Cochran's estate (the "Estate") without the goodwill associated with the mark, the goodwill having the previous year been separately assigned to the trust entity.

151.   Cochran's estate did not practice law, nor did it provide professional legal services, (the services identified in the '153 Reg.), during the period since the '153 Reg. has been extant.

152.   Neither Cochran nor the Estate had in place any valid, legally effective executed license agreement between it and the trust or Plaintiff governing use of THE COCHRAN FIRM mark at the time of Cochran's death in 2005.

153.   In 2007, the Estate executed and had recorded in the Trademark Office an "Assignment" of its entire purported interest in the '153 Reg. to TCF-CCGSS.  The document is silent regarding the preceding two years during which the Estate purportedly owned the mark and registration but the separate trust entity owned the goodwill. Because the business and goodwill in the mark were never transferred, owned by, nor inured to the Estate, the assignment to TCF-CCGSS was naked, and the '153 Reg. is invalid.

154.   No trademark license agreement exists nor was one ever entered into between Plaintiff and McMurray or TCF-CCGSS and McMurray, neither with McMurray individually nor as managing partner of TCFLA-GP. The Parties have not by writing nor implication emplaced terms governing goodwill in connection with the mark, nor quality control, nor were these terms contemplated in any unsigned draft agreements provided to McMurray. Significantly, neither Plaintiff nor TCF-CCGSS exercised control over the quality of services provided by McMurray or TCFLA-GP, including without limitation control over McMurray's and TCFLA-GP's marketing materials, and over the premises at the Los Angeles office.  There is thus no valid license that exists even implicitly between the parties, and if such license were found to exist it would be without the business and goodwill of the mark and thus naked, therefore the '153 Reg. is invalid.

155.   Similarly, Plaintiff does not have and/or did not always have valid trademark license agreements with all of its other purported licensees/affiliates providing for the goodwill generated by use of the subject mark of the '153 Reg. to inure to the owner of the mark and providing Plaintiff with a measure of quality control, nor did it exercise appropriate control over its licensees.

156.   McMurray is not and for many years has not been a member of Plaintiff's nor TCF-CCGSS' organizations and the parties to this proceeding are thus not part of one single firm, nor otherwise comprising a common entity, as such terms are commonly understood in the context of law practices.

157.   On June 7, 2011, a Declaration of Continuing Use under Section 8 was filed with a supporting specimen in the '153 Reg. in the name of "The Cochran Firm, P.C.", in the Trademark Office.  According to the Declaration, the supporting specimen comprises "the Cochran Firm brochure".  In the Declaration, Plaintiff identifies itself as a corporation registered in Alabama even though there was no existing Alabama corporation named "The Cochran Firm, P.C." at the time the Declaration was executed and filed.

158.   The foregoing 2011 specimen identifies a number of cities, including Los Angeles, where Plaintiff allegedly maintains offices.

159.   However, by way of example, TCFLA-GP is a separate and distinct business organization from Plaintiff, as is borne out in TCFLA-GP's Amended and Restated Partnership Agreement dated as of January 1, 2010, which does not identify Plaintiff nor TCF-CCGSS or any of its individual shareholders as members of the LA Partnership.

160.   Plaintiff represents itself as "America's Law Firm", where consumers are led to believe the firm is operating in 21 cities throughout the United States, in Atlanta, Birmingham, Chicago, Dallas, Detroit, Dothan, Houston, Huntsville, Jackson, Las Vegas, Los Angeles, Memphis, Miami, Minneapolis, Milwaukee, Mobile, New Orleans, New York, Philadelphia, Tuskegee, and Washington DC.

161.   However, Plaintiff is not organized as a law firm partnership or corporation with satellite offices in the cities identified in the foregoing paragraph. Rather, Plaintiff operates a licensing or franchising scheme with independent law practitioners in the cities identified above concerning use of the THE COCHRAN FIRM mark.  Plaintiff is thus able to evade, and has in the past evaded, liability for its licensees'/franchisees' acts of malpractice or other common shared liabilities of law firm partnerships and law corporations, by denying it is a single, national firm.

162.   Plaintiff has not operated as a single firm nor as an association through valid licenses in the 21 cities identified in its specimen supporting its June 2011 Declaration.

163.   To the extent they exist, Plaintiff's rights in the THE COCHRAN FIRM mark are invalid and unenforceable as a result of naked licensing and/or naked assignment of the mark by Plaintiff and/or its predecessor(s) in interest.

164.   The '153 Reg. is void as a result of naked licensing and/or naked assignment of the mark by Plaintiff and/or its predecessor(s) in interest.

165.   The '153 Reg. is void as a result of fraudulent statements made in the 2004 Declaration alleging acquired distinctiveness.

166.   The '153 Reg. is void as a result of fraudulent signature on the 2004 Declaration filed in support of the registrability of the mark on the Principal Register.

167.   The '153 Reg. is void as a result of fraudulent and deceptively misleading statements made in the June 2011 Declaration of Continuing Use and supporting specimen thereto.

168.   The '153 Reg. is void because Plaintiff is a non-existent entity. Plaintiff has perpetrated fraud by self-identifying in registration-related filings as "The Cochran Firm, P.C.", an Alabama corporation, when no such-named entity is registered in Alabama.

169.   The '153 Reg. is void because it fails to comply with formalities governing identification of the registrant, as required under the Trademark Office rules of practice.

170.   Plaintiff's misuse of the '153 Reg. is threatening McMurray's ability to conduct business and is interfering with same, to the detriment of McMurray and his clients, as well as creditors of TCFLA-GP.

171.   Plaintiff is not the owner of the '153 Reg. Had Plaintiff provided the Court with the actual trademark assignment document rather than the incorrect abstract in its moving papers, it would have revealed the '153 Reg. was assigned to TCF-CCGSS, <u>not</u> Plaintiff, obviating Plaintiff's claims of irreparable injury and exposing the fraudulent basis upon which the extant preliminary injunction was sought.

172.   The aforementioned conduct alleged with particularity above constitutes fraud on the U.S. Trademark Office with respect to the '153 Reg.  As a result of Plaintiff's and its predecessor(s) in interest's perpetrating this fraud on the Trademark Office, the '153 Reg. should be cancelled under 15 U.S.C. Section 1064(3).  Pursuant to 15 U.S.C. Section 1119, this Court should certify to the Director of the U.S. Trademark Office that the '153 Reg. be permanently removed from the records of the U.S. Trademark Office.

173.   The aforementioned conduct alleged with specificity above constitutes a sufficient basis for the Court to cancel the '153 Reg. under 15 U.S.C. Section 1064(3).  Specifically, (i) Plaintiff's inconsistent and contradictory enforcement of the THE COCHRAN FIRM trademark; (ii) its failure to adequately police and/or control uses of same; and (iii) its own inconsistent licensing and use of the trademark, constitute abandonment of the mark, at least in California.  Pursuant to 15 U.S.C. Section 1119, this Court should certify to the Director of the U.S. Trademark Office that the '153 Reg. be permanently removed from the records of the U.S. Trademark Office.

## FIFTH COUNTERCLAIM FOR RELIEF

### Unfair Competition, False Advertising, Misappropriation and Passing Off, Lanham Act 15 U.S.C. § 1125(a)

### Against Plaintiff, TCF-CCGSS,  Cherry And Givens

174.   McMurray re-states and re-alleges the facts set forth in all the paragraphs above as though fully set forth herein.

175.   As alleged herein, Plaintiff, TCF-CCGSS, Cherry and Givens have utilized material false and misleading descriptions and representations of fact in connection with their legal services and firm composition and expertise on their website and commercial advertising and promotion.

176.   The foregoing descriptions and representations are made and used in interstate commerce: the Cochran Firm Brochure is used in connection with offices in several states, the same "national firm" allegations are made on the Internet on Plaintiff's, TCF-CCGSS's, and their licensee/franchisee/agents' web sites, and elsewhere including without limitation Cherry's and Givens' THE FIRM, INC. entity's promotion of "The Cochran Firm" web site and toll-free referral phone number.

177.   These Counterdefendants' descriptions and representations misrepresent the nature, quality, geographic scope and composition of the law firm services by holding themselves out as "a" law firm "with offices nationwide and a team of some of the country's most experienced and aggressive … lawyers" when in fact "The Cochran Firm" is a sort of naked licensing arrangement.

178.   Counterdefendants' descriptions and representations misrepresent that the law firm is one firm nationwide and includes the attorneys listed as members of the Cochran firm who are not in fact actually part of a single firm, and in some cases are not part of any affiliate-firm(s), either.  A clear example of this is at Exhibit D, which shows how Plaintiff and/or TCF-CCGSS, through an Illinois licensee, promoted McMurray as "Managing Partner" of "The Cochran Firm" even though McMurray is not licensed to practice law in Illinois.  Plaintiff continued its misrepresentation of

AMENDED COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS RANDY H. McMURRAY, P.C. AND RANDY H. McMURRAY

1   McMurray's name and likeness by passing off McMurray as Plaintiff's managing

2   partner even after Plaintiff obtained a fraudulent preliminary injunction alleging it

3   would be irreparably harmed were McMurray to so describe himself.

4        179.   As shown in Exhibit D, Counterdefendants misappropriated McMurray's

5   professional reputation, name and likeness to pass him off as part of Plaintiff by

6   misrepresenting McMurray as part of Plaintiff's organization, and falsely associating

7   the accomplishments and expertise of McMurray as those of Plaintiff and TCF-

8   CCGSS.

9        180.   McMurray has been and continues to be damaged by these acts and

10  misrepresentations.

11       181.   Members of the public have been misled by these false and misleading

12  representations and they have been damaged and continue to be damaged by these acts

13  and misrepresentations.

14                **SIXTH COUNTERCLAIM FOR RELIEF**

15          **RIGHT OF PUBLICITY, California Civil Code § 3344**

16            **Against Plaintiff, TCF-CCGSS, Cherry And Givens**

17       182.   McMurray re-states and re-alleges the facts set forth in all the paragraphs

18  above as though fully set forth herein.

19       183.   The Illinois affiliate/licensee of Plaintiff, on information and belief, at the

20  direction and/or approval of Plaintiff, TCF-CCGSS, Cherry and Givens (who allegedly

21  assist with and approve advertising and marketing of offices of the Cochran firm

22  around the United States) knowingly used McMurray's identity as the "brand" and

23  public image of Plaintiff's Illinois office and the alleged national network of the

24  Plaintiff and TCF-CCGSS, without  McMurray's consent, by using his name, likeness

25  and biographical accomplishments as a center piece of online promotional materials for

26  Plaintiff's licensees.  This use of McMurray's likeness has thus become a significant

27  aspect of the Counterdefendants' public image.

28

184.   At no time prior to the commencement of their knowing use of McMurray's likeness by counterdefendants did they obtain the consent of McMurray. The consent of McMurray was, and is, required for all such Uses.

185.   On information and belief, McMurray's professional reputation, name and likeness provides Counterdefendants significant commercial value, enhancing their reputation and goodwill.

186.   Having thus used McMurray's identity to substantially endorse their reputation, Counterdefendants are estopped to deny the significant commercial value they obviously believed that McMurray's identity, name and likeness would provide them.

187.   The conduct and actions of Counterdefendants has been malicious, willful, wrongful, intentional, and without any right or entitlement whatsoever.  The unauthorized commercial use of McMurray's identity, name and likeness was the foreseeable, intended result of Counterdefendants' actions, especially in light of the several times McMurray apprised Counterdefendants of the infringing use.

188.   As a direct, proximate and foreseeable result of counterdefendants' conduct alleged herein, McMurray has been injured in his business and professional credibility and opportunities, and has suffered emotional distress, and discomfort as a result of their use of his identity, name and likeness.  Furthermore, McMurray has been deprived of the compensation that would have been due him to enhance and create the Counterdefendants' image and reputation nationwide as his likeness has been used and has achieved for Counterdefendants.  On information and belief, he has become associated with Counterdefendants and may be limited in his future business and professional opportunities.

189.   In addition to damages, McMurray is entitled to recover from Counterdefendants the commercial value they inherently attributed to use of McMurray's identity and to any benefit and profits derived from the unauthorized use of McMurray's identity.  The use of McMurray's identity as the image of

1  counterdefendants is an integral part of the brand image itself, which cannot be

2  reasonably separated from the brand.  McMurray has generated and enhanced the

3  "goodwill" of counterdefendants and their firm.

4      190.   Any success in obtaining lucrative, high profile and other cases and profits

5  is derived from the unauthorized use of McMurray's identity.

6      191.   McMurray is entitled to compensation for the commercial value of the use

7  of his identity both for the period of use prior to the filing of this counterclaim and so

8  long as Defendant continues to use it hereafter.

9      192.   As Counterdefendants' conduct comprising unauthorized use of

10  McMurray's likeness in violation of California Civil code §3344 is willful and

11  malicious, McMurray is entitled to punitive damages, according to proof.

12      193.   McMurray is also entitled to an award of attorneys' fees and costs in

13  accordance with California Civil Code Section 3344.

14         **SEVENTH COUNTERCLAIM FOR RELIEF**

15  **UNFAIR COMPETITION (California Bus. & Prof. Code § 17200) Against All**

16         **Counterdefendants**

17      194.   McMurray re-states and re-alleges the facts set forth in all the paragraphs

18  above as though fully set forth herein.

19      195.   By the acts alleged herein, Counterdefendants have violated, and continue

20  to violate, Business and Professions Code section 17200 through their unlawful, unfair,

21  fraudulent and deceptive business acts and practices.

22      196.   As a direct and proximate result of Counterdefendants' unlawful, unfair

23  and fraudulent acts, McMurray and members of the public have been misled and

24  suffered financial loss and injury to their business and property.

25  **UNLAWFUL**

26      197.   The unlawful acts and practices of Counterdefendants alleged above

27  constitute unlawful business acts and/or practices within the meaning of California

28  Business and Professions Code section 17200. Counterdefendants' unlawful business

1   acts and/or practices as alleged herein have violated numerous federal and state,

2   statutory and/or common laws - and said predicate acts are therefore per se violations

3   of section 17200. These predicate unlawful business acts and/or practices include, but

4   are not limited to, the following:

5        198.   Racketeering in violation of Civil RICO 18 U.S.C. §§ 1964(c) and (d),

6   unfair competition, false advertising, misappropriation and passing off in violation of

7   Lanham Act 15 U.S.C. §1125(a); and deceit in violation of California Civil Code §§

8   1709, 1710;

9        199.   The unlawful acts alleged herein caused financial loss to McMurray,

10   directly and proximately injuring him in his business or property.

11   **UNFAIR**

12       200.   Counterdefendants' fraudulent acts as alleged herein constitute tortious

13   conduct and gave counterdefendants an unfair competitive advantage over McMurray

14   and other attorney-competitors who did not engage in such practices. Said misconduct,

15   as alleged herein, also violated established law and/or public polices:  Therefore

16   Counterdefendants' acts and practices alleged herein were and are unfair within the

17   meaning of Business and Professions Code section 17200.

18       201.   In addition, as alleged herein, Counterdefendants intended that California

19   consumers would be misled and/or deceived into believing that certain attorneys were

20   affiliated with Cochran when they were not, that certain law offices were part of a

21   nationwide network which would be responsible to clients, which they were not, and

22   misled consumers by touting the achievements of McMurray as a managing partner of

23   the firm at the same time denying him his partnership.  There was no benefit to

24   consumers outweighing the harm.  These practices are immoral, unethical, oppressive,

25   unscrupulous and/or substantially injurious to consumers and thus unfair within the

26   meaning of Business and Professions Code section 17200.

27       202.   At all relevant times, Counterdefendants' unfair acts alleged herein: (a)

28   caused substantial injury to McMurray and the Public; (b) had no countervailing

1  benefit to consumers or to competition that could possibly outweigh this substantial

2  injury; and (c) caused injury that could not have been avoided or even discovered by

3  ordinary consumers, because it resulted from Counterdefendants' concealment, failure

4  to disclose material information that only the Counterdefendants knew or could have

5  known. Thus, Counterdefendants' acts and/or practices as alleged herein were unfair

6  within the meaning of Business and Professions Code Section 17200.

7  **FRAUDULENT**

8       203.   Counterdefendants' acts and practices, as alleged herein, were likely to,

9  and did, deceive McMurray and the Public. Counterdefendants' communications, acts,

10  practices and non-disclosures, as alleged herein, therefore constitute fraudulent

11  business acts and practices within the meaning of California Business and Professions

12  Code section 17200.

13       204.   McMurray and California consumers have been, and continue to be,

14  deceived by Counterdefendants' unlawful, unfair and fraudulent conduct as alleged

15  herein. McMurray and California consumers have suffered injury and lost money as a

16  direct result of the unlawful conduct as alleged herein. The unlawful, unfair, deceptive

17  and/or fraudulent business acts and practices of Counterdefendants described herein

18  present a continuing threat to McMurray and to the citizens of California.

19       205.   McMurray and others have lost money and suffered injury to their

20  business and property as a result of the acts of Counterdefendants complained of

21  herein.

22       206.   By the unlawful, unfair and fraudulent practices described above,

23  Counterdefendants have been unjustly enriched and have misappropriated and hold

24  monies and property rightly belonging to McMurray for which restitution is an

25  appropriate remedy.  McMurray seeks restitution of the money taken and the money

26  and property in which McMurray has a vested interest and any profits of

27  Counterdefendants in which McMurray has an ownership interest.

28

AMENDED COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS RANDY H. McMURRAY, P.C.
AND RANDY H. McMURRAY

## EIGHTH CAUSE OF ACTION FOR AVOIDANCE OF FRAUDULENT TRANSFER UNDER UNIFORM FRAUDULENT TRANSFER ACT (Civ. Code ' 3439 et seq.)

### (Against All Named and DOE Counterdefendants)

207.   McMurray re-allege and incorporates herein as though set forth in full the allegations of fact contained in paragraphs 1-109 above.

208.   Counterdefendants Cherry and Givens directed, Counterdefendants Dunn, Barrett, and Koplow carried out, and Counterdefendants TCF-CCGSS and Dunn Law, APC knowingly received, the transfer of TCFLA-GP's property and assets to the detriment of the existing claims of TCFLA-GP's legitimate creditors, including McMurray, who has outstanding loans to TCFLA-GP and is owed distribution as a TCFLA-GP partner. These transfers were made as set forth in paragraphs 65, 67-71, 74, 76, 60 above.

209.   Counterdefendants knowingly made and participated in these transfers with actual intent to defraud McMurray and other creditors of TCFLA-GP. These transfers to TCF-CCGSS and Dunn Law, APC were made without reasonably equivalent value to TCFLA-GP. At the time of these transfers, Counterdefendants knew or reasonably should have known that TCFLA-GP would incur debts beyond its ability to pay them as they became due.

210.   McMurray requests that the Court void the abovementioned transfers to TCF-CCGSS and Dunn Law, APC. McMurray requests that the Court order the attachment of the transferred assets and impose a constructive trust in favor of McMurray over those assets.

211.   As a proximate result of Counterdefendants' violation of the UFTA, McMurray has suffered actual loss to be proven at trial. At all times herein alleged, said Counterdefendants acted willfully, wantonly, with oppression, and/or malice, and with a conscious disregard of McMurray's rights, such that punitive damages are proper and warranted.

## NINTH CAUSE OF ACTION FOR CONVERSION
### (Against All Named and DOE Counterdefendants)

212.   Plaintiff re-alleges and incorporates herein as though set forth in full the allegations of fact contained in all the paragraphs above.

213.   From 2007 onwards, a valid relationship of partnership existed between McMurray and Dunn and, later, Barrett, as principals of the corporate partners of TCFLA-GP. By virtue of this relationship of partnership, McMurray actually possessed or had the right to immediate possession of a joint proprietary interest in, and a right of mutual control over the TCFLA-GP's assets, pursuant to the partnership agreement and statutes.

214.   Counterdefendants actively interfered with McMurray's interests in and rights of possession of TCFLA-GP's assets by appropriating and converting to the exclusion of Claimants, *inter alia*, TCFLA-GP's funds in its bank accounts, goodwill, attorney's fees from completed and uncompleted cases, business opportunities, settlement checks, referral fees, rental income, electronic equipment, computer software and data, internet service access, telephone numbers, internet domain names, prospective business relationships with employees and vendors, professional liability insurance coverage, and employee medical insurance coverage.

215.   Counterdefendants' interference with McMurray's rights is substantial. Their purpose in interfering with his rights was and is to convert TCFLA-GP's assets to their exclusive use, to the exclusion of McMurray.

216.   As a direct and proximate result of Counterdefendants' interference, McMurray has suffered and will continue to suffer damages in an amount equal to the value of the converted assets, plus interest from the time of conversion.

217.   In doing these acts, Counterdefendants and each of them acted with oppression, fraud, and malice in that the conversion of TCFLA-GP's assets was committed with full knowledge and the intent that it would substantially interfere with

1  McMurray's interests and rights in the property. As a result, punitive damages are

2  warranted.

3  ### TENTH COUNTERCLAIM FOR RELIEF

4  ### Breach of Fiduciary Duty/Constructive Trust

5  ### (Against Counterdefendants Dunn and Barrett)

6  218.   McMurray re-states and re-alleges the facts set forth in all the paragraphs

7  above as though fully set forth herein.

8  219.   By the series of acts described herein, Counterdefendants have diverted

9  and held income earned by and owed to McMurray for litigating and settling various

10  cases and for cases handled by McMurray.

11  220.   As partners and colleagues, Counterdefendants owed a fiduciary duty to

12  McMurray to have the firm pay to McMurray the monies that he earned.

13  221.   Counterdefendants failed to turn over funds earned by McMurray in

14  breach of that fiduciary duty.

15  222.   Counterdefendants locked McMurray out of the computer system, denied

16  his status as a partner and failed to turn over to McMurray the fees and settlement

17  funds that he earned and were due him.

18  223.   Further, Counterdefendants sent a "change of firm" notification to various

19  courts and cases that falsely re-directed communications intended for McMurray to the

20  Counterdefendants.

21  224.   This misinformation and misdirection caused monies due McMurray to be

22  sent to Counterdefendants instead of McMurray.

23  225.   Counterdefendants did not forward those monies to McMurray; rather,

24  they have retained those funds.

25  ### PRAYER FOR RELIEF

26  WHEREFORE McMurray prays for judgment against Counterdefendants and

27  each of them jointly and severally, as follows:

28

AMENDED COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS RANDY H. MCMURRAY, P.C.
AND RANDY H. MCMURRAY

1          1.        Treble damages plus costs and attorneys fees pursuant to RICO 18 U.S.C.

2    §§ 1962, 1964.

3          2.        Damages for Deceit, Fraudulent Transfer, Tortious  Interference with

4    Prospective Business Advantage, violations of the Lanham Act, 15 U.S.C. § 1125(a);

5    for, for violation of the Right of Publicity Act of California and for violation of the

6    Right of Publicity Act of Illinois.

7          3.        Punitive damages, in accordance with California Civil Code § 3294.

8          4.        Cancellation of United States Trademark Registration No. 2,930,153.

9          5.        Restitution by Counterdefendants of the money taken and the money and

10   property in which McMurray has a vested interest and any profits of

11   Counterdefendants in which McMurray has an ownership interest pursuant to Cal Bus

12   & Profs Code §§17200, 17203-17205.

13         6.        Constructive trust for monies earned by McMurray and held by

14   Counterdefendants.

15         7.        Attachment of monies and assets fraudulently transferred in accordance

16   with Cal Civil Code § 3439.07.

17         8.        Disgorgement of Profits.

18         9.        Injunctive relief prohibiting Counterdefendants' use of McMurray's and

19   TCFLA-GP's identities and tax ID numbers.

20         10.       Attorneys' fees and costs in accordance with RICO 18 U.S.C. §, 1964,

21   California Civil Code § 3344.

22         11.       For the declaratory, equitable, injunctive, equitable monetary and/or other

23   relief requested.

24

25

26

27

28

AMENDED COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS RANDY H. MᴄMURRAY, P.C.
AND RANDY H. MᴄMURRAY

12.     For such other and further relief as this Court may deem just and proper.

Date: April 12, 2013                        **NOVAK DRUCE CONNOLLY BOVE +
                                            QUIGG LLP**


By: _____
                    Victor K. Sapphire


Attorneys for Defendants Randy H.
McMurray, P.C. and Randy H. McMurray

AMENDED COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS RANDY H. McMURRAY, P.C.
AND RANDY H. McMURRAY

1
2

## **DEMAND FOR JURY TRIAL**

3
4
5      Defendants and Counterclaimants Randy H. McMurray, P.C., and Randy H.

6   McMurray, individually hereby demand trial by jury.

7
8
9
10
11
12
13
14
15
16
17   Date:  April 12, 2013              **NOVAK DRUCE CONNOLLY BOVE +
                                         QUIGG LLP**
18
19
20                                      By: _____
                                              Victor K. Sapphire
21
22                                      Attorneys for Defendants Randy H.
                                        McMurray, P.C. and Randy H. McMurray
23
24
25
26
27
28

**PROOF OF SERVICE**

1

2      I am employed in the County of Los Angeles, State of California, over 18 years

3 of age, and not a party to this action. My business address is 333 South Grand Avenue,

4 Suite 2300, Los Angeles, California 90071.

5      On April 12, 2013 I served the following document:

6 **AMENDED COUNTERCLAIMS OF DEFENDANTS AND**
**COUNTERCLAIMANTS RANDY H. McMURRAY, P.C. AND RANDY**

7 **H. McMURRAY**

8 on the parties or their counsel shown below, by placing documents in a sealed

9 envelope addressed as follows:

| | |
|---|---|
| Richard M. Wirtz, Esq.<br>rwirtz@wirtzlaw.com<br>Erin K. Barns, Esq.<br>ebarns@wirtzlaw.com<br>WIRTZ LAW APC<br>4365 Executive Drive, Suite 1460<br>San Diego, California 92121<br><br>Thomas D. Foster, Esq.<br>foster@tdfoster.com<br>TD Foster - Intellectual Property Law<br>12626 High Bluff Drive, Suite 150<br>San Diego, CA 92130<br>*Attorneys for The Cochran Firm, P.C.,*<br>*Samuel A. Cherry, J. Keith Givens, and*<br>*Barvie Koplow* | Brian T. Dunn, Esq.<br>bdunn@cochranfirm.com<br>THE COCHRAN FIRM-CALIFORNIA<br>4929 Wilshire Boulevard, Suite 1010<br>Los Angeles, CA 90010-5856<br>*Attorneys for Counter-Defendants Dunn*<br>*Law, APC, Brian T. Dunn, and Joseph*<br>*Barrett* |

     Service was accomplished by causing said document to be delivered by hand to

the addresses stated above.  In addition, courtesy copies of the indicated document

were sent to counsel at the email addresses noted above.

     I declare that I am employed in the office of a member of the bar of this Court at

whose direction the service was made and that this declaration was executed on April

12, 2013, at Los Angeles, California.

                               *Catherine Zukowski*
                                Catherine Zukowski

PROOF OF SERVICE

# EXHIBIT A



Home        Government Records        Business Entities        Search        Details

## Business Entity Details

| The Cochran Firm, P.C. | |
|---|---|
| Entity Type | Domestic Professional Corporation |
| Place of Formation | Alabama |
| Issued To | Keith Givens<br>163 West Main Street<br>Dothan, AL 36301 |
| Status | Name Reservation - Active |
| Issue Date | 3-12-2013 |
| Expiration Date | 7-11-2013 |
| | |

Browse Results        New Search

P.O. Box 5616               Alabama Directory | Media | Online Services | Alabama.gov        Phone: (334) 242-7200
Montgomery, AL 36103-5616        Statements/Policies | Alerts | Survey/Comments | Feeds | Contact Us        Fax: (334) 242-4993

EXHIBIT A, Pg. 53

# EXHIBIT B

JOHNNIE L. COCHRAN, JR. (2,3,12,13)
PHILIP M. DAMASHEK (12)
HARVEY WEITZ (12)
ARNOLD L. KLEINICK (12)
IVAN S. SCHNEIDER (12)
SAMUEL A. CHERRY, JR. (1,2)
J. KEITH GIVENS (1,4,5)
JOCK M. SMITH (1)
CAMERON A. STEWART (3)
RANDY H. MCMURRAY (3)
BRIAN T. DUNN (3,10)
FREDERICK W. GOODING, JR. (3)
SHAYNE J. HELLER (3)
JAMES D. MONTGOMERY (7)
BRIAN J. SHOOT (12)
HEZEKIAH SISTRUNK, JR.(5)
ROBERT B. JACKSON (12)
GREGORY J. CANNATA (12)
RICHARD B. ANCOWITZ (4,12)
JANE LAMBERTI SAMS (5)
JOSEPH D. LANE (1,4)
LOUIS J. MITCHELL (11,12)
CLIFFORD J. STERN (11,12)
CHARLES J. NOLET (12)
J. FARREST TAYLOR (1,14)
THOMAS C. MARSZEWSKI (7)
KEITH A. KLEINICK (12)
LLOYD M. ROBERTS (12)
STEVEN GOLD, M.D. (12)
LARRY GIVENS (1,5)
KEITH H. GROSS (12)
THOMAS N. NICKLES, M.D. (1)
JAY D. WILLIAMS, JR., M.D. (1)
ERIN K. HURLEY (12)
DEREK SELLS (12)
CARL E. UNDERWOOD, III (1)
DAVID W. DRUKER (12)
TERRY G. KEY (1)
JUDY A. KEENAN (8,12)
DOUGLAS HOPSON (7)
RANDALL W. SCHWARTZ (7)
S. MARK ANDREWS (3)
JOSEPH S. ROSATO (11,12)
ANGELA J. MASON (1,3,5)
PAUL A. MARBER (11,12)
AUDREY M. TOLSON (5)
SHEAN D. WILLIAMS (5)
LAWRENCE A. WILSON II (12)
ELIZABETH VICKERS ADDISON (1)
JONATHAN S. DAMASHEK (2,11,12)
ANDREW L. WEITZ (12)
DOUGLAS HOPSON (7)
DIANE WELCH BANDO (12)
DONALD D. CASALE (5)
STEVEN J. ZALOUDEK (5)
THOMAS V. DEFFINA (12)
JAMES M. LANE (12)
CATHLEEN GIOVANNINI (9)

Also Admitted in:
(1) Alabama
(2) Dist. of Columbia
(3) California
(4) Florida
(5) Georgia
(6) Hawaii
(7) Illinois
(8) Michigan
(9) Missouri
(10) Nevada
(11) New Jersey
(12) New York
(13) Ohio
(14) Virginia

April 21, 2003

Randy H. McMurray, Esquire
Wilshire Highland Building
4929 Wilshire Boulevard, Suite 1010
Los Angeles, CA 90010

    *RE:*    *Congratulations*

Dear Randy:

    Please let this letter serve to memorialize your elevation in the firm to the status of a named partner of The Cochran Firm's Los Angeles office. Beginning May 1, 2003 all printed material ordered (letterhead, business cards, envelopes, etc.) will be in the name of Cochran, Cherry, Givens, Smith, Stewart & McMurray, P.C.

    Announcements may be prepared for the local and state bar publications. A press release providing details about you and your professional position with the firm may be sent to any legal publication or news service you feel appropriate.

    The firm will be making changes to its website and other Los Angeles office related publications reflecting you as a named partner in the firm. We are proud of your accomplishments as a trial lawyer over the 17 years you have practiced law in Los Angeles. We are equally proud of your accomplishments as a member of our firm for the past four years. Our firm has grown and prospered in no small part due to your efforts. Our professional and personal lives have been rich by your participation in the firm.

4929 WILSHIRE BOULEVARD, SUITE 1010   LOS ANGELES, CALIFORNIA 90010
(323) 931-6200 • FAX: (323) 931-9521

Randy H. McMurray, Esquire
April 21, 2003
Page 2

 Congratulations on achieving this professional milestone.  We look forward to practicing together with you in the coming years.

     Sincerely,

     COCHRAN, CHERRY, GIVENS,
     & SMITH, P.C.

     Johnnie L. Cochran, Jr.

     Samuel A. Cherry, Jr.

     J. Keith Givens

     Jock M. Smith

     Cameron Stewart

JKG/bn

# EXHIBIT C

### GENERAL PARTNERSHIP AGREEMENT
### OF
### THE COCHRAN FIRM LOS ANGELES PARTNERSHIP

THIS GENERAL PARTNERSHIP AGREEMENT of THE COCHRAN FIRM LOS ANGELES, effective as of February 1, 2007, by and between RANDY H. MCMURRAY, P.C., a Professional Corporation and THOMAS DUNN INVESTMENT GROUP, INC., a General Corporation.

The above-named corporations agree that upon the commencement date of this partnership, they shall be deemed to have become partners in business. The purposes, terms and conditions of this partnership are as follows:

1. Name - The firm name of the partnership shall be The Cochran Firm Los Angeles.

2. Principal place of business - The principal place of business of the partnership shall be 4929 Wilshire Blvd., Ste. 1010, Los Angeles, California 90010.

3. Purpose – The purpose and character of the business of the partnership shall be to provide legal services and to engage in any and all activities related or incidental to carrying out the foregoing, and to conduct and engage in any and all activities permitted by law in furtherance of the business of the Partnership.

4. Term - The partnership shall commence on and continue until dissolved by mutual agreement of the partners.

5. Capital contribution and distribution of profits and losses -

| Name of Partner | Amount of Initial Contribution | Partnership Interest |
|---|---|---|
| Randy H. McMurray, PC | $60,000 | 66.66% |
| Thomas Dunn Investment Group, Inc. | $30,000 | 33.34% |
| | | 100% |

A division of profits and losses shall be made at such time as may be agreed upon by the partners and at the close of each fiscal year. The profits and losses of the partnership shall be divided between the partners according to the above schedule.

6. Control - The partners shall have exclusive control over the business and each partner shall have rights in the management and conduct of the partnership business according to their partnership interest stated above in Section 5. Any difference arising as to the ordinary matters connected with the partnership business shall be decided by a third party arbitrator chosen and agreed upon by the partners. Any act beyond the scope of this partnership agreement or any contract that may subject this partnership to liability in excess of one hundred thousand dollars shall be subject to the prior written consent of all of the partners.

7. Disputes - Disputes that would jeopardize new business, contracts, or existing clients and cannot be resolved by the partners within thirty days will be submitted to a mutually agreed upon arbitrator whose decision will be final. Any disagreements or differences that affect the management of the partnership business and would jeopardize new business, contracts, or existing clients and cannot be resolved by the partners within thirty days will be submitted to an arbitration process designed to repair the partnership relationship and solve said differences or disputes.

8. Selling out - If a general partner decides to sell their interests in the partnership business to the remaining partner the interests will be valued at the one half the current business equity plus two percent or the in effect cost of living percentage. Payment for the interests sold shall be made over a period of three years. No general partner may sell their interests in the partnership business to a third party unless it is mutually agreed to by the general partners. Thirty days written notice of proposed sell out to each general partner by the selling partner is required

9. Dissolution - In the event of retirement, expulsion, bankruptcy, death, or insanity of a general partner, the remaining partners have the right to continue the business of the partnership under the same name by themselves, or in conjunction with any other persons they select.

Signatures of the Partners

_____

Randy H. McMurray, President of RANDY H. MCMURRAY, P.C.

_____

Brian T. Dunn, President of THOMAS DUNN INVESTMENT GROUP, INC.

# EXHIBIT D

Attorney Randy Mcmurray, The Cochran Firm, Los Angeles, Ca...          http://www.jamesdmontgomery.com/bio/randymcmurray.asp

**CALL US TODAY** 312.977.0200

Home     Firm Overview     Attorneys     Practice Areas     Our Cases     Contact





Personal Injury >          Medical Malpractice >          Federal Civil Rights >          Civil Litigation >

## Contact An Attorney

NOTE: Labels in **bold** are required.

| Name |
| E-mail |
| Phone |
| Briefly describe your legal issue here. |

☐ I have read and understand the disclaimer.

**Submit the form**

One North LaSalle Street, Suite 2450
Chicago, Illinois 60602

Phone: 312.977.0200
Fax: 312.977.0209

Map & Directions

## Attorney Profiles

**Randy H. McMurray**
Los Angeles, California,
*Managing Partner*
*phone* (323) 931-6200
*fax*     (323) 931-9521
*email*

A native Angeleno and graduate of Southwestern University School of
Law in Los Angeles, Randy H. McMurray is the managing partner at
Cochran, Cherry, Givens, Smith & Montgomery, LLC Los Angeles, where he practices
mainly in the areas of catastrophic personal injury, products liability, and medical
malpractice.

Mr. McMurray's trial litigation skills were honed early on in his professional career. While in
law school, he was a member of the Mock Trial Team, and he took Honors in the National
Moot Court competition. Currently, Mr. McMurray is a member of the Board of Governors
of the Consumer Attorneys Association of Los Angeles, and served as President of the
organization in 2009. He currently sits on the Board of Directors of the Diversity Law
Foundation.

**Areas of Practice:**
    Business Fraud
    Medical and Professional Liability
    Governmental Entity Liability
    Road Design
    Products Liability
    Catastrophic Personal Injury Litigation

**Bar Admissions:**
    California, 1986
    U.S. District Court Central District of California, 1987

**Education:**
    Southwestern University School of Law, Los Angeles, California, 1986
    J.D.
    *Honors:* National Moot Court Honors
    *Honors:* Member, Mock Trial Team

    California Polytechnic University, Pomona, California, 1982
    B.A.
    Major: Political Science

EXHIBIT D, Pg. 58

Cochran, Cherry, Givens, Smith & Montgomery, L.L.C., is based in Chicago and serves people throughout Illinois, including Chicago, Chicago Heights, Cicero, Berwyn, Schaumburg, Evanston, Hoffman Estates, Oak Lawn, Oak Park, Mount Prospect, Tinley Park, Northbrook, Skokie, Arlington Heights, Cook County, Lake County, DuPage County, Kane County and Will County, Illinois.

© 2013 by Cochran, Cherry, Givens, Smith & Montgomery, L.L.C. All rights reserved. Disclaimer | Site Map
Law Firm Internet Marketing by FindLaw, a Thomson Reuters business.

EXHIBIT D, Pg. 59



EXHIBIT D, Pg. 60



EXHIBIT D, Pg. 61



**Los Angeles Catastrophic Injury Attorney | California office of The Cochran Firm - Mozilla Firefox**

File Edit View History Bookmarks Tools Help

Los Angeles Catastrophic Injury Attorne... +

www.cochranfirm.com/offices/los-angeles.html

california state bar — Search — OK Safe Web ▸ — Identity Safe ▸

Remembering
Johnnie (1937-2005)

**Free Case Review**

Submit Your Case for Review

**Attorneys:**

Brian Dunn

Joseph Barrett

Richard Barnwell

Robert Torres

Ibiere Seck

Jamon R. Hicks

The Cochran Firm 1

Brian Dunn

Randy McMurray

You Tube   0:03 / 0:36

* Type Of Case

What Happened?

Submit

* required | Privacy Policy

Read our Los Angeles Blog

The Cochran Firm — with over 120 attorneys in offices across the country — began in 1981 at The Law Offices of Johnnie L. Cochran, Jr. at 4929 Wilshire Boulevard in Los Angeles, California. Overlooking the grand estates of Hancock Park, with the Hollywood hills and legendary Hollywood sign in the background, Johnnie Cochran continued to build the brilliant legal career he began in 1963. Though the firm has grown to nineteen offices in fourteen states, the Los Angeles office is still the place that Mr. Cochran called "home".

The **Los Angeles** office of
The **Cochran Firm** has

**Address:**

4929 Wilshire Blvd.1010
Los Angeles, CA 90010

**Phone Number:**

(323) 435-8205

**Fax:**

(323) 931-9521

**Website:**

The Cochran Firm Los Angeles

Los Angeles Catastr...   5 Microsoft Word   8 Adobe Reader

4:29 PM

EXHIBIT D, Pg. 62